The complainant, Houbigant Sales Corporation, is the sole exclusive distributor of the products manufactured by Houbigant, Incorporated, which are in fair and open competition with commodities of the same general class produced by others. It has expended large sums of money in widely advertising these products in this state and elsewhere, as a result of which it has established therein a valuable good will.
On or about October 30th, 1937, complainant in order to avail itself of the protection afforded by the statute, P.L. *Page 41 1935 ch. 58 p. 140 (now Rev. Stat. §§ 56:4-3 et seq.), established minimum prices for the resale of its commodities within this state and entered into divers contracts with retailers in this state fixing minimum prices for the same, which prices became effective thereafter. At the same time complainant announced to the retail trade, including the defendant herein, that it intended at all times to maintain such prices, and that its products were not to be resold by retailers in the state of New Jersey including the defendant at less than the prices established.
The defendant, Woods Cut Rate Store, is engaged in selling various cosmetic preparations, including those produced by the complainant. The defendant admittedly violated the provisions of the statute in that, after notice, it advertised, offered for sale and sold complainant's branded and trade-marked commodities at prices less than the prices specified in the contracts made by complainant with such retailers.
The matter is before the court on the return of an order to show cause why injunction should not issue.
The allegations of the bill of complaint are not denied. The facts are not in issue. The sole issue raised is one of law. Substantially it is argued that there exists here no legal contract which is made the basis of the action since there is no legal or valid consideration shown therein.
The contract in the instant case was between complainant as the sole distributor of Houbigant and Cheramy products, advertised, distributed and sold under the trade-mark, brand or name of Houbigant or Cheramy, and a retailer. It provided that in consideration of the promises and the mutual obligations therein assumed, and for the purpose of obtaining for the parties and other retailers the benefits of state and federal laws in respect to resale price maintenance, the distributor will supply or cause to be supplied to the retailer his requirements of such products for retail sales; that the retailer will not (except as permitted by the statute) directly or indirectly, advertise, offer for sale or sell any of distributor's products, at less than the minimum resale price then in effect under the agreement and as established thereunder from time to *Page 42 
time by the distributor; that the distributor may, upon ten days' written notice to the retailer, amend the schedule of resale prices and products and change the same. The retailer in said agreement expressly acknowledged that the distributor's good will in such product and the good will of competing retailers will be irreparably injured by any violation of the agreement and consented therein to the entry of a decree of injunction in the event of violation of such agreement, and the complainant also agreed to police the industry in its interest and that of the retailer against violation of the minimum sales prices established by the agreement.
Section 56:4-5 of the New Jersey Fair Trade act (as revised), validates contracts relating to trade-marked or branded articles which contain the following provisions:
"(a) That the buyer will not resell such commodity except at the price stipulated by the vendor;
"(b) That the producer or vendee of a commodity require upon the sale of such commodity to another, that such purchaser agree that he will not, in turn, resell except at the price stipulated by such producer or vendee." Source P.L. 1935 ch. 58 § 1 p.140.
Section 56:4-6 provides that:
"Willfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions of section 56:4-5 of this title, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of any person damaged thereby." Source P.L. 1935 ch. 58 § 2 p. 141.
The questions presented are all dependent upon the construction to be given to the word "contract." The statute itself does not supply a definition of this word. Its proper construction must be gathered from an analysis of the statute as a whole and a consideration of the circumstances and objectives which led to its enactment.
Mr. Justice Sutherland, speaking of the similar Fair Trade statute of the State of Illinois, said in Old DearbornDistributing Co. v. Seagram-Distillers Corp., 299 U.S. 183;81 L.Ed. 109; 57 Sup. Ct. 139: *Page 43 
"The primary aim of the law is to protect the property — namely, the good will of the producer, which he still owns. * * * It proceeds upon the theory that the sale of identified goods at less than the price fixed by the owner of the mark or brand is an assault upon the good will, and constitutes what the statute denominates `unfair competition.'" See, also, Johnson Johnson
v. Weissbard, 121 N.J. Eq. 585; Bristol-Myers Co. v. L.Bamberger Co., 122 N.J. Eq. 559.
This primary aim, the statute seeks to accomplish by making it lawful for the owner to make contracts establishing the fixed price, and by making it unlawful for any retailer, with knowledge of such fixed price, to sell below that price. With regard to this latter object and purpose, it was of course necessary that there be some instrument, vehicle or medium by which that fixed price is specified and established.
It would seem that from the standpoint of accomplishing the aims and purposes which the legislature had in mind in the provisions of section 56:4-6, it might equally as well have specified a mere notice or other purely unilateral instrument or act by the manufacturer or producer, as and for the vehicle and evidence of the establishment of the standard price; but whether for reasons of convenience or some other reason, it did not do so; it is not necessary here to ascertain or determine why it did not do so.
The fact is that the statute does use the word "contract." The thing which the statute, in section 56:4-6, designates as unfair competition, and makes actionable, is the selling below the price fixed in any "contract" entered into pursuant to the provisions of section 56:4-5. Obviously, therefore, in order to call the statute into operation, there must have been a price or schedule of prices fixed by, or incorporated in, a contract — something which can reasonably be deemed to come within the meaning and scope of that name. But it is equally obvious that the legislature did not deem that the particular form or kind of contract was of any materiality. Nothing is made requisite in that respect, under section 56:4-6, except that it be a "contract entered into pursuant to the *Page 44 
provisions of section 56:4-5;" and reference to section 56:4-5 shows that all that is thereby made requisite is that the contract be one relating to the sale or resale of trade-marked or branded articles and containing a designation of a resale price, and a promise by the vendee that he will not sell below such price.
The "contract" mentioned in section 56:4-6 of the statute is merely utilized as a price-fixing device made available to the owner of the trade-mark for his protection. That the "contract" is nothing more than a vehicle, is demonstrated by the fact that a "contract" with a single retailer binds all other retailers when it comes to their attention. The object of the statute is clearly satisfied when the "contract" states the prices fixed by the manufacturer and the promise of the retailer to observe them.
Anything which can fairly be deemed a "contract," under the widest and most general scope of that name — (and containing such a designation of price and such a promise) — is all that is required either expressly or impliedly, by the terms of the statute, or to accomplish the objects and purposes of the statute. The words "no contract," in section 56:4-5, and "any
contract," in section 56:4-6, are correspondingly used and each is all-comprehensive.
It is doubtless true that in order to constitute such a contract, there must be something in the nature of a consideration to support and make legally obligatory the retailer's promise not to sell below the designated price — something which at law would constitute a valid consideration in support of such promise. But it seems clear that no particular or special type or kind of consideration is requisite, either expressly or impliedly, to support this particular promise. It is sufficient if there be anything in the way of consideration which would at law be valid consideration to support any promise.
That which constitutes adequate consideration for a promise is defined to be "a benefit to the party promising, or a loss or detriment to the party to whom the promise is made." 13 C.J. 311
§ 144. As stated by Professor Williston — Contracts *Page 45 
(Rev. Ed.) 323 § 102 — it is "in substance, a detriment incurred by the promisee, or a benefit received by the promisor, at the request of the promisor."
It is not necessary that there be any counter-promise by the owner or producer to the retailer; nor that there be any loss or detriment to the owner or producer. It is sufficient if there be a benefit to the retailer-promisor.
A consideration of the results which would follow from the application of a contrary doctrine confirms this view. If it were true that the "contracting" retailer must receive, as consideration, counter-promises by the owner or producer, inequality among retailers as a whole with respect to price maintenance would inevitably result. The retailer who expressly undertook an obligation to maintain stipulated prices and who in exchange received some special consideration from the producer, would be thereby preferred over all other retailers who come under a duty to uphold those prices by virtue of section 56:4-6 of the act and who might be entitled to similar benefits. Manifestly, it was not the intention of the legislature to compel the manufacturer to single out certain retailers for preferential treatment. Indeed, a recent federal statute, the Robinson-Patman act, forbids discriminatory treatment of retailers. C. 592,49 Stat. 1528; 15 U.S.C.A. §§ 13, 13(a), 13(b). The succeeding Congress enacted the Miller-Tydings bill which validates fair trade contracts in interstate commerce. C. 690,50 Stat. 673; 15 U.S.C.A. § 1. It seems reasonably clear that neither Congress nor state legislatures contemplated a construction which would create an irreconcilable conflict between contemporaneous federal enactments and defeat, in part, the primary objectives of the Fair Trade laws.
The language of the opinion of the supreme court of the United States and the New Jersey court of errors and appeals in passing upon the constitutionality of the Fair Trade acts confirms the views here advanced. Thus, Mr. Justice Sutherland, in OldDearborn Distributing Co. v. Seagram-Distillers Corp., supra
(at p. 195) said:
"It [the Fair Trade act] proceeds upon the theory that *Page 46 
the sale of identified goods at less than the price fixed by the owner of the mark or brand is an assault upon the good will. * * *"
Similarly, Mr. Justice Bodine, in Johnson Johnson v.Weissbard, supra (at p. 586) said:
"It [the Fair Trade act] is a mere direction to a resident merchant that he must not resell trade-marked or branded articles at less than the price fixed by the producer or owner of such marked commodities. * * * But he may not utilize the good will of another without complying with the statute which brands as unfair the sale of identified goods at less than the price fixed by the `producer.'"
In Bristol-Myers Co. v. L. Bamberger Co., supra, we said:
"The method to be employed by the manufacturer under section 1 of the act is for the manufacturer to fix minimum retail selling prices in one or more contracts with retail dealers."
Nothing was said about the role to be played by retailers in establishing prices. All courts agreed that the manufacturer fixed the price under the Fair Trade acts. Manifestly, these statements were inaccurate if the prices announced by a manufacturer did not become effective unless the retailer's promise to observe them was supported by some special or particular type of consideration or counter-promise. For in that event, it would be the retailer and manufacturer and not the manufacturer alone who would be fixing prices.
There is a benefit to the retailer-promisor — that which is deemed and believed by both parties to be a benefit to him — in the sale and delivery to him by the producer of the producer's goods. He expects to make a satisfactory profit out of reselling such goods. The producer was under no legal obligation to make such sale to the retailer. The act of such sale would therefore be an adequate consideration in exchange for the retailer's promise, if so understood and intended by both parties; and a contract essentially to this effect, "In consideration of producer having sold me such and such goods, I promise that I will not resell them at less than such and such *Page 47 
price. (Signed) Retailer." — would be a sufficient contract within the meaning and intent of the statutory provisions.
Similarly the producer was under no legal obligation to establish a fixed price. The establishment of such a fixed price would be a benefit to the retailer, because upon such establishment, section 56:4-6 of the statute would come into operation, and the retailer would receive the benefit of the protection thereunder against the competition of underselling by other retailers. Hence it would seem that the very act of establishing the fixed price would be adequate consideration for the retailer's promise; and that a contract essentially to this effect: "In consideration of producer having established the fixed price of $1 per quart for his product, I hereby promise and agree that I will not sell any of such product to anyone at less than that price. (Signed) Retailer." — would be a sufficient contract within the meaning of the statute.
Under this view it is evident that every fair trade contract which has come before this court is, in fact, a valid agreement when tested by common law standards of consideration. For in every such undertaking the manufacturer and retailer were bargaining for the establishment of retail prices. To this end the manufacturer supplied a schedule of prices for the products bearing his trade-mark and the retailer in consideration of such action by the manufacturer agreed to maintain them. It is true that in many cases additional obligations were undertaken by the manufacturer; for example, to supply or cause to be supplied to the retailer all his requirements of the manufacturer's products at prevailing rates or the agreement of the manufacturer to police the business and enforce established prices against all engaged in it. These promises, however, were not essential to support the retailer's undertaking. It is well established that a promise or executory undertaking made in exchange for the performance of any lawful act which the doer was not already under legal duty to perform, gives rise to a legally enforceable contract at common law. 1 Williston, Contracts (1st. ed.,1927), § 102; Atlantic Pebble Co., Ltd., v. Lehigh Valley *Page 48 Railroad Co., 89 N.J. Law 336. The establishment of minimum retail prices by the manufacturer was such an act, and is sufficient consideration for the retailer's undertaking to observe such prices. Cf. Ingersoll Bro. v. Hahne Co.,88 N.J. Eq. 222; 89 N.J. Eq. 332. Contract in the instant case examined and held enforceable.
Preliminary injunction will issue.
An order will be made in conformity with the advice contained in the conclusions of Vice-Chancellor Stein, which are hereby adopted as the opinion of the court.
 (Sgd.) LUTHER A. CAMPBELL, C.