19 N.J. Super. 210 (1952)
88 A.2d 238
HOFFMANN-LA ROCHE, INC., A CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF,
v.
MAX WEISSBARD AND HARRY WEISSBARD, INDIVIDUALLY AND TRADING AS WEISSBARD BROS., DEFENDANTS.
JOHNSON & JOHNSON, A CORPORATION OF THE STATE OF NEW JERSEY, AND McKESSON & ROBBINS, INCORPORATED, A CORPORATION OF THE STATE OF MARYLAND, PLAINTIFFS,
v.
CHARMLEY DRUG CO., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided March 31, 1952.
*212 Mr. Joseph H. Stamler for the plaintiffs Hoffmann-LaRoche, Inc., and Johnson & Johnson (Messrs. Lorentz & Stamler, attorneys).
Mr. Walter F. Waldau for the plaintiff McKesson & Robbins (Messrs. Stryker, Tams & Horner, attorneys).
Mr. Sanford Freedman for the defendants Max Weissbard et al. (Messrs. Bilder, Bilder & Kaufman, attorneys; Mr. John M. Kaufman, on the brief).
Mr. Joseph Kraemer for the defendant Charmley Drug Co.
FREUND, J.S.C.
These two cases involve a common question of law. They have a common object and the issues save in one respect are identical. They were instituted to test the enforceability against non-signers of the Fair Trade Act, R.S. 56:4-3 et seq., by reason of the decision of the United States Supreme Court in Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951).

HOFFMANN-LA ROCHE v. WEISSBARD
The question here is whether the plaintiff, a New Jersey corporation, may enjoin the defendants, owners of local drugstores, from selling plaintiff's products under the prices stipulated in a contract made in this State between the plaintiff and another retailer. The defendants are not parties to the contract, but had notice thereof.
The plaintiff manufactures pharmaceuticals in Nutley, New Jersey; maintains business offices in seven states; and employs over 200 persons outside New Jersey. It has executed *213 "fair trade" contracts in 45 states, and uses the same price list for its products throughout the United States. Its advertising which is on a national scale cost over $1,000,000 in 1951.
Prior to the Schwegmann decision, the defendants purchased plaintiff's products directly from the plaintiff in New Jersey; but since then the products have been purchased outside the State and delivered to the defendants' stores in New Jersey. The specific violation alleged is that the defendants advertised and sold Vi-Penta Drops at $3.49, whereas the price stipulated by the plaintiff in the "fair trade" contract was $3.95. The merchandise had been purchased from jobbers in New York City. The defendants contend that having purchased the plaintiff's products in interstate commerce and not having signed a "fair trade" agreement they are not bound by the prices established in the plaintiff's "fair trade" contract executed in New Jersey.

JOHNSON & JOHNSON v. CHARMLEY
Johnson & Johnson, a New Jersey corporation, is a manufacturer of pharmaceuticals, with plants in Illinois, New Jersey and New York. Its trademarked products are sold throughout the United States, and it stipulates the minimum prices at which they should be sold, of which the trade is advised through its own pamphlet entitled "Net Selling Prices" and other drug publications.
The co-plaintiff, McKesson & Robbins, a Maryland corporation, is a wholesale distributor of the products of various manufacturers, including Johnson & Johnson, maintaining warehouses and offices in 35 states, including New Jersey.
The defendant, a New Jersey corporation, operates a retail drugstore in the City of Newark, where it sells Johnson & Johnson products. It had signed no "fair trade" agreement with either plaintiff.
In an endeavor to overcome the effect of the Schwegmann decision, the plaintiffs devised a plan to bind non-signers *214 to resale price maintenance. By letter they notified their customers, including the defendant, that the following legend would be endorsed on invoices:
"FAIR TRADE AGREEMENT. Purchaser, by accepting delivery from Seller of any fair traded commodity, agrees not to resell such commodity, by direct or indirect means, at less than the prescribed net retail minimum price published by the Producer or Distributor whose trademark, brand or name appears on the commodity. This agreement not applicable to sales in non-fair trade states or District of Columbia."
Thereafter, the defendant by telephone ordered Johnson & Johnson products, some from McKesson & Robbins' Newark Division and some from its New York Division. The orders were accepted without the imposition of any restriction or condition respecting resale price maintenance. However, the invoices, when received, bore the legend above set forth. Thereupon, the defendant by letter advised McKesson & Robbins' Newark and New York Divisions and Johnson & Johnson "that your Fair Trade agreement as set forth on the invoices and in your notices does not bind us and is illegal. Therefore, we are at liberty to sell the merchandise below Fair Trade prices." Later, the defendant purchased additional Johnson & Johnson products from a Philadelphia jobber without any restrictions.
The plaintiffs seek a declaratory judgment respecting the validity of the alleged contract and an injunction to restrain the defendant from reselling the products of Johnson & Johnson under the minimum resale prices. The defendant urges that being a non-signer and not having otherwise agreed to resale price maintenance, it is not bound.
Thus, the issue specific to this case is whether the inscription on the invoice and the retention of the goods by the purchaser constitutes a contract for resale price maintenance under our New Jersey Fair Trade Act and the Miller-Tydings Amendment. The subordinate question is whether the legend is sufficiently definite and certain to warrant an injunction against price-cutting.
*215 Resale price maintenance contracts were prohibited as restraints of trade by the Sherman Anti-Trust Act, 26 Stat. 209, c. 647; 15 U.S.C.A. § 1 (July 2, 1890); Dr. Miles Medical Co. v. John D. Park & Sons Co., 220 U.S. 373, 31 S.Ct. 376, 55 L.Ed. 502 (1911); and as violative of the Federal Trade Commission Act, 38 Stat. 717, c. 311; 15 U.S.C.A. § 41 (1914); Federal Trade Commission v. Beech-Nut Packing Co., 257 U.S. 441, 42 S.Ct. 150, 66 L.Ed. 307 (1922); Armand v. Federal Trade Commission, 78 Fed.2d 707 (C.C.A. 2 1935), certiorari denied 296 U.S. 650, 56 S.Ct. 309, 80 L.Ed. 463 (1935). At common law in this State, price-fixing agreements were illegal as against public policy. Ingersoll v. Goldstein, 84 N.J. Eq. 445 (Ch. 1915).
In 1931 California enacted the first state fair trade act. In 1935 Illinois enacted a statute, Smith-Hurd. Rev. Stat. 1935, c. 121 1/2, § 188 et seq., and in the same year New Jersey enacted its counterpart, R.S. 56:4-3 et seq., c. 58, L. 1935, page 140. The constitutionality of these fair trade laws was upheld by the United States Supreme Court; Old Dearborn Distributing Co. v. Seagram-Distillers Corp. (McNeil v. Joseph Triner Corp.), 299 U.S. 183, 57 S.Ct. 139, 81 L.Ed. 109 (1936); Pep Boys v. Pyroil Sales Co. and Kunsman v. Max Factor & Co., 299 U.S. 198, 57 S.Ct. 147, 81 L.Ed. 122 (1936). As a consequence, all of the states, with the exception of Missouri, Texas and Vermont, and the District of Columbia, enacted fair trade statutes. See 2 C.C.H. Trade Reg. Rep. (9th ed.), sec. 7011 et seq.
Heretofore, injunctive relief against price-cutting by non-signers with notice was afforded under the state fair trade acts. A single valid contract entered into between a producer and a retailer pursuant to R.S. 56:4-5 was held to be sufficient to bind all other retailers having notice, to respect the price stipulated in the contract, R.S. 56:4-6; Johnson & Johnson v. Weissbard, 121 N.J. Eq. 585 (E. & A. 1937); Bristol-Myers Co. v. L. Bamberger & Co., 122 N.J. Eq. 559 (Ch. 1937), affirmed 124 N.J. Eq. 235 (E. & A. 1938); *216 Lentheric, Inc., v. Weissbard, 122 N.J. Eq. 573 (Ch. 1937); Houbigant Sales Corp. v. Woods Cut Rate Store, 123 N.J. Eq. 40 (Ch. 1937); Revlon Nail Enamel Corp. v. Charmley Drug Shop, 123 N.J. Eq. 301 (Ch. 1938); Burstein v. Charline's Cut Rate, 126 N.J. Eq. 560 (Ch. 1940); Frank Fischer, &c., Corp. v. Ritz Drug Co., 129 N.J. Eq. 105 (Ch. 1941); California Oil Co. v. Reingold, 5 N.J. Super. 525 (Ch. Div. 1949); Max Factor & Co. v. Kunsman, 5 Cal.2d 446, 55 Pac.2d 177 (1936), affirmed 299 U.S. 198, 57 S.Ct. 147, 81 L.Ed. 122 (1936); Bourjois Sales Corp. v. Dorfman, 273 N.Y. 167, 7 N.E.2d 30 (Ct. App. 1937).
To implement the state fair trade acts, Congress in 1937 passed the Miller-Tydings amendment to the Sherman Act, Title VIII, 50 Stat. 673, 693, c. 690; 15 U.S.C.A., § 1, and thereby expressly exempted contracts or agreements prescribing minimum prices for the resale in interstate commerce of trade-marked commodities, provided such contracts were valid under state statute. However, the federal act differs from most of the state statutes in that it does not contain a "non-signer" clause. The Schwegmann case provided the United States Supreme Court with the first opportunity to consider the effect of this variance. The plaintiffs doing an interstate business had obtained an injunction against price-cutting by an operator of a retail supermarket, a non-signer with notice of a "fair trade" contract made by the plaintiffs under the Louisiana Fair Trade Act, La. Gen. Stat., sec. 9809.1 et seq. (1936). This statute, like the New Jersey act, contained the non-signer provision and prohibited the resale of commodities, except at prices "stipulated" by the vendor. The Supreme Court reversed, ruling that a retailer who does not sign a contract for price maintenance is not to be bound by the schedule of a price maintenance plan although he has notice thereof. Mr. Justice Douglas, speaking for the majority of the court said:
"The omission of the nonsigner provision from the federal law is fatal to respondents' position unless we are to perform a distinct legislative function by reading into the Act a provision that was *217 meticulously omitted from it. * * * When they seek * * * to impose price fixing on persons who have not contracted or agreed to the scheme, * * * that is not price fixing by contract or agreement; that is price fixing by compulsion. That is not following the path of consensual agreement; that is resort to coercion. * * * price maintenance power granted a distributor is limited to voluntary engagements. * * *
The contrary conclusion would have a vast and devastating effect on Sherman Act policies. If it were adopted, once a distributor executed a contract with a single retailer setting the minimum resale price for a commodity in the state, all other retailers could be forced into line. Had Congress desired to eliminate the consensual element from the arrangement and to permit blanketing a state with resale price fixing if only one retailer wanted it, we feel that different measures would have been adopted  either a nonsigner provision would have been included or resale price fixing would have been authorized without more. Certainly the words used connote a voluntary scheme. Contracts or agreements convey the idea of a cooperative arrangement, not a program whereby recalcitrants are dragged in by the heels and compelled to submit to price fixing. * * *
We search the words of the sponsors for a clear indication that coercive as well as voluntary schemes or arrangements are permissible. We find none. * * * And when we read what the sponsors wrote and said about the amendment we cannot find that the distributors were to have the right to use not only a contract to fix retail prices but a club as well. The words they used  `contracts or agreements'  suggest just the contrary."
Even if the Schwegmann case has had no impact upon the decisions of our courts as to intrastate matters, it is certain that to warrant an injunction where interstate transactions are involved, the defendant must be a signatory to a "fair trade" contract. While the Miller-Tydings amendment does not specify a written contract, nevertheless, the repeated use of the term "non-signers" in the decisions would imply that only a signatory to a contract may be bound in interstate commerce. Therefore, in each case against a non-signer the essential question is whether the business is intrastate or interstate.
Quite obviously, in the cases sub judice, the transactions were interstate. The merchandise offered for sale in this State was purchased by the defendants outside the State. However, if the defendants had purchased the plaintiffs' *218 products within the State, the Sherman Act would still apply. "Competitive practices which are wholly intrastate may be reached by the Sherman Act because of their injurious effect on interstate commerce. * * * So too the marketing of a local product in competition with that of a like commodity moving interstate may so interfere with interstate commerce or its regulation as to afford a basis for Congressional regulation of the intrastate activity. It is the effect upon the interstate commerce or its regulation, regardless of the particular form which the competition may take, which is the test of federal power." United States v. Wrightwood Dairy Co., 315 U.S. 110, 62 S.Ct. 523, 526, 86 L.Ed. 726 (1942). "There is an obvious distinction to be drawn between a course of conduct wholly within a state and conduct which is an inseparable element of a larger program depending for its success upon activity which affects commerce between the states." United States v. Frankfort Distillers, Inc., 324 U.S. 292, 65 S.Ct. 661, 663, 89 L.Ed. 951 (1945). "* * * Given a restraint of the type forbidden by the (Sherman) Act, though arising in the course of intrastate or local activities, and a showing of actual or threatened effect upon interstate commerce, * * * the restraint must fall." Mandeville Island Farms, Inc., v. American Crystal Sugar Co., 334 U.S. 219, 62 S.Ct. 996, 1005, 92 L.Ed. 1329 (1948).
"The source of the restraint may be intrastate, as the making of a contract or combination usually is; the application of the restraint may be intrastate, as it often is; but neither matters if the necessary effect is to stifle or restrain commerce among the states. If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." United States v. Women's Sportswear Ass'n., 336 U.S. 460, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949).
The subject of fair trade and pertinent issues here discussed have been comprehensively treated by Professor James A. Rahl in a masterly article, Resale Price Maintenance, etc., *219 46 Ill. L. Rev. 349 (1951), from which the following is quoted:
"Since invalidation of nonsigner controls in the Schwegmann case was based upon the Sherman Act, a federal regulation of interstate commerce, a potential zone is left for lawful local operation of the state laws. * * * One thing is clear. The sales whose prices are directly controlled need not themselves be interstate sales. `Affecting interstate commerce' is enough, and it is difficult to see how a producer whose produce is dealt with on any substantial scale in a multistate market can get himself out of interstate commerce for nonsigner control purposes. * * * The only immune area would seem to be one in which the business producing the controlled product is substantially isolated from interstate commercial contact. * * * Nonsigner controls are still available in isolated cases. But they are of dubious value to any manufacturer whose ultimate market is multi-state in scope. And it is almost invariably these manufacturers who desire, or whose dealers desire, Fair Trade."
Although the plaintiffs maintain manufacturing plants and sell in this State, for the purposes of these proceedings they are, nevertheless, engaged in interstate commerce; their products are distributed and their price schedules circulated on a national scale. It would be completely unrealistic to treat these cases as simple intrastate transactions, like the sale by a local farmer of eggs locally produced to a local grocer for resale to local consumers.
Following the Schwegmann decision, jurisdictions other than New Jersey have reversed their previous positions and denied injunctions against non-signers where interstate commerce was involved or affected. In Sunbeam Corp. v. Wentling, 192 Fed.2d 7 (C.C.A. 3 1951), certiorari denied 341 U.S. 944, 71 S.Ct. 1012, 95 L.Ed. 1369 (1951), the court had enjoined a non-signer from selling plaintiff's merchandise in Pennsylvania below prices scheduled under the Pennsylvania Fair Trade Act. In reversing the judgment upon a rehearing, Judge Goodrich said:
"In our former decision we denied Sunbeam protection against Wentling in interstate sales but did affirm the granting of the injunction against intra-state sales at less than the price Sunbeam had *220 fixed. It is now clear in view of the Supreme Court (Schwegmann) decision that even when we cut down the protection Sunbeam wanted we still gave it more than it should have had. The Supreme Court's conclusion is perfectly clear. One who does not sign a price maintenance contract cannot be subjected to the nonsigner provisions of a state fair trade law where interstate commerce is involved."
See, also, Sunbeam Corp. v. Civil Service Employers Cooperative Ass'n., 187 Fed.2d 768 (C.C.A. 3 1951).
Similarly, in cases in New York, injunctions against non-signers were denied where interstate commerce was involved. In Emerson Radio & Phonograph Corp. v. Standard Appliances, Inc., 112 N.Y.S.2d 615 (Sup. Ct. June 26, 1951), the plaintiff as a manufacturer of trade-marked products was engaged in interstate commerce, but it was contended that Emerson, its distributor, which had "fair trade" agreements with retailers in New York City, was engaged only in intrastate commerce. The plaintiff asserted that inasmuch as Emerson sold to local dealers who in turn sold to local consumers, the activity was entirely intrastate; hence, not subject to the Sherman Anti-Trust Act. The court took a contrary view:
"Although price fixing agreements by a plaintiff engaged in interstate commerce may purport to affect only resales within the State of New York, it does not follow that they do not involve interstate commerce which brings the transaction within the scope of the Sherman Act."
See, also, Bulova Watch Co., Inc., v. S. Klein-on-the-Square, Inc., 105 N.Y. Supp.2d 175 (Sup. Ct. 1951).
Where, however, both parties were local retailers and the transaction was exclusively local, the court held that interstate commerce was not involved or affected, and awarded an injunction. Jacobson Bros. Exquisite Footwear, Inc., v. Rolda Fine Shoes, Inc., 105 N.Y. Supp.2d 520 (Sup. Ct. 1951).
The Supreme Court of Oregon enbanc heard reargument in Lambert Pharmacal Co. v. Roberts Bros., 233 Pac.2d 258 *221 (1951). The plaintiff, a Delaware corporation, with a manufacturing plant in Missouri, was authorized to do business and paid taxes in Oregon. It shipped its products to its own warehouse in Oregon, filled orders there without reference to the home office and had executed contracts with retailers in Oregon pursuant to the state fair trade act, of which the defendant although a non-signer had notice. In vacating the injunction, the court said:
"The evidence demonstrates that not only the general business but the price maintenance arrangement of the plaintiff is nationwide in scope. * * * When a change in price is made three signed contracts are obtained in every state in the United States and every retail druggist association in the United States is notified. * * * It is enough to bring the transactions complained of within the scope of the Sherman Act that they substantially affect interstate commerce. * * * Nor does the fact that price-fixing or price maintenance applies only to intrastate retail sales remove the conduct from the reach of the statute if such conduct be `an inseparable element of a larger program dependent for its success upon activity which affects commerce between the states.' United States v. Frankfort Distillers, Inc., supra. * * * The fact, if it be such, that some part of the plaintiff's business is transacted locally, does not in the slightest degree lessen the effect of its nation-wide price-fixing program, initiated in Missouri and carried through in part in New York, upon the interstate commerce in which it is engaged on a large scale. * * * We hold, on the authority of the Schwegmann case, that the plaintiff's price resale maintenance activities are illegal per se."
In Calvert Distillers Corp. v. Sachs, 48 N.W.2d 531 (1951), the Supreme Court of Minnesota held its fair trade act, which is identical with ours, "invalid and inoperative insofar as it purports to authorize the enforcement of minimum fair-trade resale prices against any person who is not a party to the contract by which the minimum resale prices were established with respect to commodities in interstate commerce."
The courts of California have pursued the same course and denied injunctive relief if the transaction involved or affected interstate commerce. Cal-Dak Co. v. Sav-on-Drugs, *222 Inc., 242 P.2d 333 (Sup. App. 1951); Miles California Co. v. Benatar's (Super. Ct. January 21, 1952).
See Bruno H. Greene, The Fair Trade Acts, etc., 6 Rutgers L. Rev. 425 (1952); Annotation, 19 A.L.R.2d 1139; 2 C.C.H. Trade Reg. Rep. (9th ed.), page 7281 et seq.
The federal act differs in another respect from the New Jersey and the Louisiana acts, and was commented upon in the Schwegmann case. The court said:
"We note to begin with that there are critical differences between Louisiana's (and New Jersey's) law and the Miller-Tydings Act. The latter exempts only `contracts or agreements prescribing minimum prices for the resale.' On the other hand, the Louisiana law sanctions the fixing of maximum as well as minimum prices, for it exempts any provision that the buyer will not resell `except at the price stipulated by the vendor.' We start then with a Federal act which does not, as respondent suggests, turn over to the states the handling of the whole problem of resale price maintenance on this type of commodity."
Manifestly, there is a distinction between "minimum" price and "stipulated" price. A "stipulated" price might be higher than the "minimum." Previously, it had been held that a "stipulated" price in a single contract with a retailer has been sufficient to bind all other retailers throughout the State. Johnson & Johnson v. Weissbard, supra; Schenley Products Co. v. Franklin Stores Co., 124 N.J. Eq. 100 (E. & A. 1937); Magazine Repeating Razor Co. v. Weissbard, 125 N.J. Eq. 593 (Ch. 1939); Frank Fischer, &c., Corp. v. Ritz Drug Co., supra; Pazen v. Silver Rod Stores, Inc., 130 N.J. Eq. 407 (E. & A. 1941). The statutes of 16 states authorize "stipulated" prices. 2 C.C.H. Trade Reg. Rep. (9th ed.), page 7011; Calvert Distillers Corp. v. Nussbaum Liquor Stores, 2 N.Y. Supp.2d 320 (Sup. Ct. 1938); Shulman, The Fair Trade Acts, 49 Yale L.J. 607 (1940). Before the Schwegmann decision, Louisiana had changed its statute to provide for "minimum" rather than "stipulated" prices, La. Rev. Stat. 51:392 (1950), but the change was unimportant to the issue in the case as the decision was based upon the absence of the non-signer provision. While the *223 court's observations might, therefore, be considered dictum, they are not without weight and, hence, reference is made to them here, although as in the Schwegmann case the variance is not the determining factor in the conclusion reached.
With respect to the particular issue in the Johnson & Johnson case, the legend on the invoice constitutes notice. Ingersoll & Bros. v. Hahne & Co., 88 N.J. Eq. 222 (Ch. 1917), 89 N.J. Eq. 332 (Ch. 1918). But more than notice is required; a contract or agreement is demanded. It is obvious that even if the legend on the invoice and the retention of the goods were held to constitute a contract, it would not be such a contract as could impose price maintenance. Price regulation must be the result of bilateral agreement and not unilateral imposition; it must be by "consensual agreement," "voluntary engagement" or "cooperative arrangement," and as the Schwegmann decision implies a signed contract is the sine qua non.
None of the elements essential for a valid contract is here present. There was surely no meeting of the minds, DeVries v. Evening Journal Ass'n. (Sup. Ct. March 17, 1952). "* * * it is an established principle, fundamental in the law of contracts, that a contractual obligation arises from the mutual consent of the parties only. The true contract, whether it be expressed or implied in fact, has its source in the common intention of the parties." P. Ballantine & Sons v. Gulka, 117 N.J.L. 84 (Sup. Ct. 1936).
An invoice is a mere detailed statement of the nature, quantity and cost or price of the things invoiced. Dows v. National Exchange Bank of Milwaukee, 91 U.S. 618, 23 L.Ed. 214 (1875); Sturm v. Boker, 150 U.S. 312, 14 S.Ct. 99, 37 L.Ed. 1093 (1893). It has been held that a notation appearing on an invoice accompanying goods ordered by telephone did not constitute a contract; that an invoice is not a contract; and that silence may not operate as an assent. Tanenbaum Textile Co. v. Schlanger, 287 N.Y. 400, 40 N.E.2d 225 (1942); Albrecht Chemical Co. v. Anderson Trading Corp., 298 N.Y. 437, 84 N.E.2d 625 (1949). *224 The retention of goods by a purchaser with notice of conditions or limitation of liability may in some instances amount to assent depending upon proof of the principles of contract. Dale v. See, 51 N.J.L. 378 (Sup. Ct. 1889); 1 Williston on Contracts (Rev. ed.), sec. 91-91D.
Plaintiffs' plan to circumvent the effect of the Schwegmann decision possesses all of the infirmaties and vices interdicted by the Supreme Court. It is a clear example of price-fixing, since the plaintiff arbitrarily set the prices at which its products are everywhere to be sold. There was no bargaining or negotiation. The plaintiffs' attempt "is price fixing by compulsion * * * resort to coercion * * * a program whereby recalcitrants are dragged in by the heels and compelled to submit to price fixing." Schwegmann Bros. v. Calvert Distillers Corp., supra. See Chafee, Equitable Servitudes on Chattels, 41 Harv. L. Rev. 945 (1928).
Moreover, the legend lacks the elements of certainty and definiteness essential to the validity of any contract. It is extremely broad in its scope and intended to cover the resale of an indefinite number of products from an indefinite number of manufacturers at unspecified prices. There is no reference to the publication "Net Selling Prices" nor to "Drug Topics Redbook" which lists resale prices for drugstore items. The legend is too vague and uncertain to constitute a valid contract. Hantell v. International Plastic Harmonica Corp., 141 N.J. Eq. 379 (E. & A. 1947); Montclair Distributing Co. v. Arnold Bakers, Inc., 1 N.J. Super. 568 (Ch. Div. 1948).
Generally in the consideration of legal issues a court is not to be concerned with the economic aspects and social philosophy motivating fair trade enactments and does not pass upon the wisdom of economic public policy, which is a legislative function; nevertheless, it does not operate in a vacuum. There are valid and forceful economic arguments on all sides of the question of the social desirability of fair trade acts. See testimony at hearings before Committee on Interstate and Foreign Commerce, House of Representatives, *225 62nd Congress, on H.R. Bill 5767, held February 4 to 20, 1952, and report thereon, No. 1437; and also articles on fair trade, Fortune magazine, January and April, 1949.
We can only assume that the various Legislatures enacted state fair trade acts in the interest and for the benefit of their citizens. However, the ease with which state lines may be crossed makes it possible to readily circumvent state law, to nullify local price fixing and to divert trade from one state to another. If it is convenient and advantageous to do so, New Jersey residents may purchase in New York, Pennsylvania or Delaware, and vice versa. The hard fact is that evasion will continue unless and until the absence of the non-signer clause in the Miller-Tydings Amendment is remedied. Whether or not such implementation is economically desirable is not a matter for judicial determination; but the fact must be recognized that as long as fair trade cannot be enforced against non-signers in interstate commerce, the floodgates remain open and the death knell continues to toll for state fair trade acts, except within the area of wholly intrastate business, a field so limited as to be practically insignificant in our economy.
Judgments accordingly.