55 N.J. Super. 230 (1959)
150 A.2d 496
NEW JERSEY STATE BAR ASSOCIATION, A CORPORATION OF THE STATE OF NEW JERSEY, ET AL., PLAINTIFFS,
v.
NORTHERN NEW JERSEY MORTGAGE ASSOCIATES, A NEW JERSEY CORPORATION, ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided April 17, 1959.
*233 Mr. Milton T. Lasher, attorney for plaintiffs.
Messrs. Milton M. and Adrian M. Unger, by Mr. Milton M. Unger, attorneys for defendants, Northern New Jersey Mortgage Associates and Northern New Jersey Abstract Company.
Messrs. Stryker, Tams & Horner, by Mr. John J. Monigan, Jr., attorneys for defendant, Lawyers Mortgage and Title Company.
SCHERER, J.S.C.
The original complaint in this case was filed by the New Jersey State Bar Association and its officers, as attorneys at law, against Northern New Jersey Mortgage Associates (hereinafter called "Mortgage Associates") and Northern New Jersey Abstract Company (hereinafter called the "Abstract Company"), both New Jersey corporations. It was alleged that these corporations were performing acts and rendering services which constituted the practice of law. An injunction was sought to restrain defendants from performing any acts or rendering any services which constituted the practice of law, since the defendants were not authorized to practice law in this State. On the motion of defendants, a summary judgment was entered dismissing the complaint. On appeal to the Supreme Court, the judgment was reversed and the cause was remanded for plenary hearing and disposition in the Chancery Division. See 22 N.J. 184 (1956).
In its opinion, the Supreme Court said, at page 196, that unless the individual plaintiffs could show specific injury the action as to them should be dismissed, and it affirmed the judgment of the Chancery Division in that respect. The *234 suit was thereafter continued in the name of the New Jersey State Bar Association alone.
No recital of the facts of the original suit will be undertaken herein, as they are fully set forth in the Supreme Court's opinion. Some background of the case is also to be found in In re Rothman, 12 N.J. 528 (1953).
Pursuant to the Supreme Court's mandate, additional testimony was taken by deposition on September 13, 1956 and in open court on January 14 and February 1, 1957. This testimony revealed that Lawyers Mortgage and Title Company (hereinafter called "Lawyers"), a corporation of New York, had purchased the physical assets, business and good will of Mortgage Associates and of the Abstract Company. Lawyers continued to operate at the same address as had the above named companies, 133 Cedar Lane, Teaneck, New Jersey, and with substantially the same personnel.
On March 4, 1957 plaintiff applied for and was granted leave to add Lawyers as a party defendant. Thereafter, a supplemental complaint was filed joining Lawyers as a party defendant and alleging as to it that since November 1, 1956, when it purchased the assets of Mortgage Associates and the Abstract Company, it had engaged in acts constituting the unauthorized practice of law. An injunction was sought enjoining Lawyers, its agents and employees, from all acts or services which constitute the practice of law.
In its answer Lawyers admitted that it had purchased all of the physical assets of Mortgage Associates and of the Abstract Company, but denied that it was engaged in the unlawful practice of law and averred that it was engaged in the business of searching, insuring titles, lending money on mortgages, and performing legitimate services in connection with its business, and that such acts as it performed were incidental to the carrying on of such business, which business was authorized by statute. It further alleged that any attempt on the part of the Supreme Court of New Jersey to limit its business activities, authorized by statute, was null and void as an attempt to alter substantive law in excess *235 of authority conferred upon it by the New Jersey Constitution of 1947, Art. VI, Sec. II, par. 3.
The case was pretried January 30, 1958, and at that time plaintiff contended that Mortgage Associates and the Abstract Company, despite the purchase of their assets and the fact that they were in the process of dissolution, were nevertheless still subject to the court's power to impose an injunction and costs in these proceedings, since the companies were properly before the court in the original suit and their subsequent dissolution did not deprive the court of jurisdiction.
It is the contention of Lawyers that such services as it performs are incidental to the carrying out of its business, are authorized by the law of this State, and do not amount to the unauthorized practice of law. It alleges that it is a corporation of the State of New York and has been engaged in the title business in that state, making searches, abstracts of title and loans secured by mortgages since 1893. Since 1949 it has been engaged, in addition, in the business of insuring titles with respect to real estate transactions, and since 1956 it has been duly authorized to transact business in New Jersey, operating under the Department of Banking and Insurance of this State, as well as of the State of New York. It admits that most of the personnel formerly employed by Mortgage Associates and the Abstract Company were retained by it as its employees, but says that it has increased its staff and has made changes in the method of carrying on the business which it purchased. It contends that it has had no business relationship with the original defendants subsequent to November 1, 1956, and that when it purchased the assets of said defendants it did not assume any obligations with respect to any of their existing debts or liabilities in litigation pending. It further contends that in the operation of its business it employs New Jersey attorneys, some of whom are on a salary basis and supervise the title operations at its Teaneck office. Others work independently on a fee basis. It also has put into effect a method *236 of employing other attorneys under the "Approved Attorneys Plan," pursuant to which these members of the New Jersey Bar make their own searches for their clients and render title reports and opinions to Lawyers, which it accepts and issues policies based on their certificates.
The business of Lawyers in New Jersey may be said to fall into three general classifications: (1) the making of mortgage loans directly by it as mortgagee; (2) the placing of mortgages for other institutions, such as banks, savings and loan associations, and other organizations desiring to loan money on mortgages, and, in connection with this, servicing the mortgage and insuring the title to the property upon which the mortgage is given as security; and (3) the insuring of titles generally to lands of corporations and individuals. A part of the latter service is causing searches to be made.
It should be noted that Lawyers did not purchase the stock of either Mortgage Associates or the Abstract Company, both of which were corporations incorporated under the General Corporation Act (N.J.S.A. Title 14), and neither of which was subject to supervision or control of the Department of Banking and Insurance of this State. Neither of these companies insured titles. Lawyers purchased only the assets of these corporations and, although it continued to occupy the space formerly used by these defendants, it had no business relationship with them and its operations were distinct and separate.
The issues generally, as defined by the pretrial order, were whether Mortgage Associates and the Abstract Company should still be enjoined; whether they were subject to having costs assessed against them, even though their voluntary dissolutions were completed during the pendency of this suit; whether the acts complained of against Lawyers constitute the illegal practice of law and, if so, what relief should be accorded the plaintiff; and whether the fact that Lawyers is a foreign corporation authorized to transact business in this State has any effect on the situation.
*237 The basis for the plaintiff's action is to protect "the public" and "the administration of justice" from the irreparable harm that will come to both as a result of the practice of law by persons not licensed or authorized to do so.
In reversing the summary judgment, the Supreme Court, at pages 198-199 of its opinion (22 N.J.), said that it would be manifestly unfair to make a general peremptory determination against the defendants in that suit  to which Lawyers was not then a party  without a complete record of the details of their business. Since this evidence was important only if the original defendants were continuing in business, and since they had sold their assets and had been dissolved before the trial of this case, no evidence on this issue was adduced. The termination of the businesses also eliminates from the case many of the other questions upon which the Supreme Court directed that testimony be taken, such as the method and manner of the transacting of those phases of the businesses which involve the practice of law, the volume and extent of those businesses, the exact relationship of the defendants inter sese, their relationship with the title insurance companies with which they did business, and the relationship between the defendants and mortgagors.
The plaintiff sought to show that George I. Rothman, the moving spirit in Mortgage Associates and the Abstract Company, was also a dominant force in the activities and policies of Lawyers; that the latter was conducting its business in relatively the same manner as Rothman had conducted the business of his companies; and that Lawyers made the same legal charges and that it also performed legal services and made charges for them.
The testimony and other evidence disclosed that Lawyers purchased all of the assets, business and good will of Mortgage Associates and of the Abstract Company on November 1, 1956. Lawyers is a public corporation whose stock at the time of its purchase of the Rothman companies' assets was listed on the New York Stock Exchange. It then had about *238 100,000 shares of stock outstanding, held by over 10,000 stockholders, and had been in business since 1893. It now operates in New Jersey under the supervision of the Department of Banking and Insurance, and in New York under the jurisdiction of a similar department of that state. The agreement of sale between Lawyers and the Rothman companies is dated October 29, 1956. Under it Rothman and his associate, David Irving, Jr., retained their stock in Mortgage Associates and the Abstract Company but sold all of the assets, business and good will of these companies. The Abstract Company was dissolved as of December 24, 1956 and Mortgage Associates as of November 3, 1957. Rothman received a substantial amount of the selling price of the companies in stock and notes of Lawyers. The notes were later discounted by Lawyers and repurchased. Rothman became chairman of the board of directors of Lawyers at a salary of $15,000 per year and a $6,000 expense account. His employment contract provided that he would act as a consultant for Lawyers. The premises formerly occupied by the Rothman companies were leased to Lawyers for 20 years. Rothman is no longer either an officer or director of Lawyers, having relinquished all offices about September 1957. As of now, he has only a small amount of its stock. About October 1957 Rothman and his partner sold the office building to Lawyers. Rothman does not do any business at all with Lawyers and it has never financed any of his properties since the sale in 1956.
After the sale there were several major changes in the operation of the New Jersey business of Lawyers. It began immediately to write title insurance, which had not been done by the Rothman companies. It also put into effect the "Approved Attorneys Plan." Rothman was not in any way connected with the operation of the office after Lawyers took over.
Lawyers employs several New Jersey attorneys to conduct its business at the Teaneck office. These individuals, most of whom were formerly employees of Rothman, read titles, *239 examine abstracts submitted by others, prepare closing papers and close titles. In one instance it was testified that a non-lawyer closed construction mortgage payments involving tract construction, but did not close the permanent mortgage loans to individual home buyers. The attorneys receive fixed salaries.
The company does not prepare legal papers, except in cases of its own mortgage loans or loans which are closed by it for its corporate clients. In some of the latter cases mortgages are taken in Lawyers' name and then, pursuant to commitments, resold to institutional investors. Lawyers does not draw deeds or affidavits of title for sellers. In only two instances since Lawyers took over the business in 1956 has it drawn deeds, and in each case this was an emergency and an accommodation to facilitate the closing because the deed presented was for some reason unusable. In neither case was a charge made for the service. Several witnesses testified that it was a company policy fixed by its general counsel that they were not to draw deeds. Admittedly, there is a supply of deed forms kept in the office, but the testimony was that these were for the convenience of members of the bar. It also has a supply of bonds, mortgages and other forms used in the title and mortgage operations.
Purchasers are represented by attorneys in about 50% of the closings, and sellers are represented in most instances. A New Jersey attorney is in charge of the closing department and, except as above noted, an attorney closes all the titles. In the case of construction loans, where the non-lawyer attends to the construction payments, he consults with the attorneys in the office if any legal problems arise. In those cases where no attorneys appear the seller usually comes in with a deed or title affidavit already prepared. In instances where there are title questions and the seller has no attorney Lawyers sends notice of the problem either to the broker involved or to the seller. It does not undertake to resolve title problems unless requested to do so by the seller. Lawyers never draws contracts of sale. It does *240 occasionally draw releases of mortgaged premises where it is insuring the title and sends the release to the mortgagee for execution together with the check for the consideration.
Lawyers has a fairly uniform rate of charges for title closings and a fixed rate for title insurance. The rates are not set forth in any written or printed schedule but are generally understood in the Teaneck office. They do not differ greatly from the charges made by the Rothman companies. In some cases a mortgage placement fee is charged.
Proof was introduced that the records in the Bergen County Register's Office disclose that numerous deeds are returned to Lawyers after the closing of titles, because there appears on the backs of such deeds a rubber stamp with Lawyers' name and address on it. Presumably, this proof was intended to raise an inference that the deeds were drawn by Lawyers. No such inference should be drawn, because it is common knowledge that upon the closing of a title the title company or the attorney for the purchaser or for the mortgagee usually undertakes the recording of the instruments and generally marks them on the back for return to it or him by the recording office. The mere presence of Lawyers' name on the back of the deeds is not proof that it drew the deeds.
There is no basis for concluding that Rothman now participates, or has any interest, in the operation of Lawyers. The proof is to the contrary. The plaintiff proceeded on the theory that the deal between Rothman and Lawyers was a subterfuge and argues that its sole purpose was to enable Rothman to escape compliance with the mandate of the Supreme Court. Plaintiff says the deal was a "lateral pass play" and was devised so that Rothman's companies could get out of the business and Lawyers could take over for his benefit. The evidence fails to support this argument. I find that the transaction was a bona fide one. It was entirely natural that when Lawyers acquired the assets and business of the Rothman companies it would continue to employ the same personnel and occupy the same offices to provide a *241 continuity of operation. But, as stated above, the evidence shows that Rothman has done no business with Lawyers since November 1, 1956, and that he ceased to be an officer and director of Lawyers in September 1957.
The proof does not preponderate in favor of the plaintiff's contention that Lawyers is practicing law. The services performed by it are the usual title company services and, except in one instance above noted, all services of a legal nature are performed by members of the bar of this State. When "Approved Attorneys" file their reports, they are paid fees and Lawyers gets no part of those fees. No proof was introduced to show that Lawyers makes any charges for what could be considered strictly legal services. The points which the company charges for placing mortgages do not constitute payment for legal services, and the placing of mortgages is not the practice of law. The points charged for mortgages, particularly those guaranteed by the Veterans Administration, are permitted by statute and the regulations of that agency.
N.J.S. 2A:170-78 (formerly R.S. 2:111-1), which is found in Article 8 of the Disorderly Persons Statute, defines as a disorderly person one who, not being licensed as an attorney or counsellor at law, performs any of the acts enumerated in that section. N.J.S. 2A:170-81 (formerly R.S. 2:111-5) excepts from the provisions of Article 8 corporations lawfully engaged in the business of searching or insuring titles to real estate, "in so far as may relate to the rendering of legal advice or to the preparation and execution of conveyances or other instruments connected with or incidental to the guaranteeing or searching of titles to real estate either by such person, partnership or corporation, or his or its employees."
While penal statutes are an aid to the judiciary in its power to regulate the practice of law, they are not a limitation upon the exercise of such power. In re Baker, 8 N.J. 321, 336 (1951), and the cases therein cited. No statute can control the judicial department in the performance *242 of its duty to decide who shall enjoy the privilege of practicing law. Re Opinion of Justices, 279 Mass. 607, 180 N.E. 725, 81 A.L.R. 1059 (Sup. Jud. Ct. 1932). So, the mere fact that the above cited statute uses the words "legal advice" does not exempt title companies from punitive action on the part of the courts if their acts constitute the practice of law, since the Legislature may not invade the province of the judiciary department in the regulation of the practice of law. To hold otherwise would be to open wide the door to legislation which might ultimately intrude upon the power of the Supreme Court to control the practice of law. Winberry v. Salisbury, 5 N.J. 240 (1950). The decisions throughout the country are uniform in holding that this may not be done.
A situation somewhat similar to that sub judice is found in the case of Conway-Bogue Realty Inv. Co. v. Denver Bar Ass'n, 135 Colo. 398, 312 P.2d 998 (Sup. Ct. 1957). There, suits were brought by the state and local bar associations against certain real estate firms and brokers to enjoin them from preparing legal documents and performing acts which the associations alleged constituted the unlawful practice of law. The documents complained of included contracts of sale, deeds, promissory notes, deeds of trust, mortgages and leases. It was alleged that the defendants gave advice concerning the legal effect of such instruments and that this constituted the giving of legal advice and, hence, the practice of law. The real estate firms and brokers admitted most of the acts charged against them but said that none of them was done other than in connection with their own business as brokers and real estate agents, and this was incidental to carrying out these businesses, for which they were duly licensed by the State of Colorado. They denied that they were engaged in the practice of law, and further said that public convenience and necessity demanded that they be permitted to fill in blanks in legal forms which they purchased, all of which forms were attorney-approved. The trial court upheld some of the contentions of the brokers *243 but enjoined them from performing certain other acts. After discussing the right of the judiciary to issue and revoke licenses to practice law and the freedom of the court to exercise this right, free from legislative control or regulation, the Supreme Court of Colorado said that there must be a distinction made between that part of the public in quest of legal advice and services, out of which arises only the relationship of attorney and client, and those of the public who are bent on leasing or selling real estate or lending money thereon, out of which arises the relationship of seller/buyer-broker, lessor/lessee-broker, or lender/borrower-broker. It went on to say that on the record it was convinced that the brokers and real estate agents did not prepare papers or give advice to any one except their customers, who through solicitation or otherwise engaged or employed them as brokers, and it reversed the judgment of the lower court in several instances.
The situation is much the same here. The persons for whom Lawyers draws bonds and mortgages do not establish with Lawyers a client-attorney relationship, but a borrower-lender relationship, or are persons seeking title insurance. The record in this case is barren of proof that Lawyers gives legal advice or performs any acts not generally accepted as being connected with and incidental to its business of guaranteeing or searching titles or placing mortgages. N.J.S. 2A:170-81.
The Colorado court, in a companion case decided the same day as the Conway-Bogue case, Title Guaranty Company v. Denver Bar Association, 135 Colo. 423, 312 P.2d 1011 (Sup. Ct. 1957), also reversed that part of the judgment entered in the trial court which enjoined a title company from preparing loan papers and releases of encumbrances in transactions in which it was a party and in which its interest appeared in the documents drawn, making reference in its decision to the Conway-Bogue case. In the Title Guaranty case, the complainant bar associations alleged that the title company was unlawfully practicing law "by preparing *244 for others, as a practice, deeds conveying real estate, promissory notes, deeds of trust and mortgages securing the same," in matters in which they were not parties to the instruments and in which they made a charge for services in the preparation of instruments and the closing of real estate transactions. Most of the acts charged were admitted by the defendant title companies, who alleged that they did it as an incident to their business of issuing policies of title insurance and that they were permitted to do so by Colorado statute. They further alleged that the preparation of such instruments was required by public convenience and necessity. The lower court enjoined the title companies from preparing promissory notes, deeds of trust and mortgages to which they were parties in cases where the defendants knew definitely that the loans would be purchased from them after closing. This was reversed by the appellate court, which held, 312 P.2d at page 1014, that "It is elementary that a layman or a corporation may prepare instruments to which he or it is a party without being guilty of the unauthorized practice of law." The injunctions issued against the title companies, preventing them from continuing a so-called escrow service in which they prepared deeds, mortgages and other instruments and provided rooms for closing titles, for which they collected a fee, were upheld. The appellate court found that such a "closing service" constituted the practice of law and was not an essential or necessary part of the business of insuring titles. The court found as a fact that the title companies, as a condition precedent to the issuance of title insurance, required the use of their escrow or closing services. The court also found that the title companies used their attorneys, who owed their undivided allegiance to the companies, to do precisely those things which a private attorney would have done for the customer if he had been called upon. The court did not criticize the use of the attorneys by the title companies, but what it did inveigh against was the fact that these attorneys charged for legal services in cases where they were representing the title companies and *245 not the customers, and such fees went into the coffers of the companies and the customers were obliged to use these services. The court upheld the right of the title companies to properly engage in the business for which they were licensed by statute, but said that such a license did not authorize them to practice law but only to draw such documents and perform such acts as were necessary to the making of insurance. The court also stated that the legislature could not constitutionally enact any law which invaded the exclusive jurisdiction of the judiciary with respect to the regulation of the practice of law, citing with approval Stewart Abstract Co. v. Judicial Commission of Jefferson County, 131 S.W.2d 686 (Tex. Civ. App.).
The facts in the Conway-Bogue and Title Guaranty cases which warranted the imposition of limited injunctions are not present here. Lawyers does not, according to the proofs, have any closing or escrow services. It does not draw legal documents except in connection with mortgage loans made to it or for its customers. The latter practice was approved in the Title Guaranty case.
In State Bar Ass'n of Conn. v. Connecticut Bank & T. Co., 145 Conn. 222, 140 A.2d 863 (Sup. Ct. Err. 1958), modifying 20 Conn. Sup. 248, 131 A.2d 646, the court dealt with complaints against the activities of the trust departments of each of the defendant banks and remarked, 140 A.2d at page 871:
"As stated above, the decisive question is whether the acts performed were such as are `commonly understood to be the practice of law.' Grievance Committee [of Bar of New Haven County] v. Payne, 128 Conn. 325, 330, 22 A.2d 623, 626."
It went on to say that the lower court erred in concluding as a matter of law that the drawing up of all of the various types of instruments drafted and composed by each of the defendants' trust department employees could not, and consequently did not, constitute the unlawful practice of law. It held that if the record indicated that the preparation of *246 various documents entailed problems, the solution of which would be commonly understood to be the practice of law, it would not hesitate to hold such acts to be unlawful by the banks. It further held that the right of the banks to conduct their trust business under an appropriate statute did not permit them to arrogate to themselves the function of an attorney.
This, of course, is the general rule, and the propriety of it is not disputed by Lawyers. The evidence, however, does not justify a finding that the acts performed by Lawyers can be construed to be those "commonly understood to be the practice of law."
See also, LaBrum v. Commonwealth Title Co. of Philadelphia, 358 Pa. 239, 56 A.2d 246 (Sup. Ct. 1948), where an action was brought by the Philadelphia Bar Association. The court there held that an important consideration in deciding whether a title company was practicing law was that it did not hold itself out to the public as willing, able or authorized to do any business except title insurance business. The title company contended that such instruments as it drew were solely in connection with its title insurance transactions. The trial court held that this constituted the unlawful practice of law and enjoined the company from drawing deeds, mortgages, assignments of mortgages, releases of mortgages and other documents in connection with and incident to applications for and issuance of title insurance policies. Holding that this was incidental to its business, the Supreme Court reversed the judgment and dismissed the complaint. To the same effect is Cooperman v. West Coast Title Company, 75 So.2d 818 (Fla. Sup. Ct. 1954).
The line between what is and what is not the practice of law cannot in this era of complex business relationships be drawn with any precision. There are areas wherein acts done by lawyers in their day-to-day practice may also be done by others without wrongfully invading the lawyers' field. It is the duty of the courts so to regulate the practice of law and to restrain such practice by laymen or corporations *247 in a common-sense way in order to protect primarily the interest of the public, and not to hamper and burden such interest with impractical technical restraints, no matter how well supported such restraints may be from the standpoint of pure logic. Cowern v. Nelson, 207 Minn. 642, 290 N.W. 795 (Sup. Ct. 1940); Gardner v. Conway, 234 Minn. 468, 48 N.W.2d 788 (Sup. Ct. 1951).
As our Supreme Court stated in 22 N.J. at page 195:
"The licensing of law practitioners is not designed to give rise to a professional monopoly, but rather to serve the public right to protection against unlearned and unskilled advice and service in matters relating to the science of the law."
Auerbacher v. Wood, 142 N.J. Eq. 485, 486 (E. & A. 1948). The Supreme Court found that the Abstract Company was practicing law, but the acts there delineated as constituting the practice of law are not, according to the evidence, being performed by Lawyers, except the drawing of bonds and mortgages, as well as releases of mortgages, in connection with its own loans or title insurance business.
In its brief plaintiff charged that the same methods of title closings which had been used by the original defendants were being used by Lawyers. The mechanics of closing a title are fairly uniform, whether performed by a title company or an attorney. The fact that Lawyers, using the same personnel as did the Rothman companies, conducts closings in the same manner as did those companies is not significant. The evidence discloses that there has been a substantial change in the business methods of Lawyers at Teaneck and a complete disassociation of any arrangement between it and the Rothman companies, even to the extent of Lawyers no longer being a tenant of Rothman and his former associate. Rothman still holds an employment contract with Lawyers, given him as part of the purchase price of his companies, but his testimony was that although he can be called upon to perform services as a consultant, he has never been requested so to do. It is inferable that the employment contract was drawn to secure favorable tax *248 considerations, rather than with expectation that Rothman would render services.
One further question raised by the pleadings concerning Lawyers requires discussion. The pretrial order defined one of the legal issues to be the effect, if any, resulting from the fact that Lawyers is a foreign corporation authorized to do business in New Jersey. The basis for this issue is not readily apparent. Neither party briefed nor argued it, nor was any evidence introduced bearing upon the point. Lawyers is under the supervision and regulation of the Department of Banking and Insurance of this State, pursuant to N.J.S.A. 17:32-1 et seq. It is amenable to the process of this court. The fact that it is a foreign corporation is unimportant in this case.
In my opinion the plaintiff has failed to sustain the burden of proof as to the allegations of the second count of the supplemental complaint relating to Lawyers and the complaint must be dismissed as to it, with the exception that Lawyers shall no longer employ a non-lawyer to handle the tract construction loan payments. No costs will be awarded Lawyers.
The first count in the supplemental complaint, as in the original complaint, is directed against the original defendants, Mortgage Associates and the Abstract Company. Plaintiff still insists that it is entitled to injunctive relief against these defendants despite their dissolution, and it relies upon the decision in Sheahan v. Upper Greenwood Lake Property Owners Ass'n, 36 N.J. Super. 133 (App. Div. 1955). This case does not stand for the proposition for which the plaintiff cites it and, in fact, is authority to the contrary. The opinion cites with approval Hoffmann-La-Roche Inc. v. Weissbard, 11 N.J. 541 (1953), that an injunction may issue to prevent an anticipated or threatened injury, either to protect against a repetition of unlawful conduct or to guard against reasonably apprehended misconduct or infringement of legal right. With the dissolution of the original defendants, there can be no anticipated or *249 threatened future injury, nor any repetition of the former unlawful conduct, nor need there be any apprehension of the infringement of any legal right.
In General Leather Products Co. v. Luggage and Trunk Makers Union, Local No. 49, 119 N.J. Eq. 432 (Ch. 1936), appeal dismissed 121 N.J. Eq. 101 (E. & A. 1936), the court held that an injunction will be denied where a change in conditions pending the suit renders the injunction unnecessary to protect the plaintiff, and that such a writ is a preventative remedy and not punishment for past conduct. See also, State v. Traffic Telephone Workers Federation of New Jersey, 142 N.J. Eq. 785 (Ch. 1948), reversed on other grounds 2 N.J. 335 (1949); 28 Am. Jur., Injunctions, sec. 8, p. 201.
While it is true, as argued by plaintiff, that the court's power to grant injunctive relief survives the discontinuance of the illegal conduct, United States v. W.T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303, 1309 (1953), the court in that case went on to say that the moving party must satisfy the court that the relief sought is needed and that there exists some cognizable danger of recurrent violation, something more than the mere possibility which serves to keep the case alive. No such danger is apparent here.
No injunction will issue against Mortgage Associates or the Abstract Company and the supplemental complaint will be dismissed as to them, but wtih costs to the plaintiff.
A judgment may be presented in accordance with these conclusions.