HOFFMANN-LaROCHE INC., A BODY CORPORATE, PLAIN-
TIFF-APPELLANT, v. MAX .WEISSBARD AND HARRY
WEISSBARD, INDIVIDUALLY AND TRADING AS WEISS-
BARD BROS., DEFENDANTS-RESPONDENTS.

Argued November 24, 1952—Decided March 2, 1953.

542

§ 1.

*Mr. Joseph H. Stamler* argued the cause for appellant (*Messrs. Lorentz & Stamler,* attorneys).

*Mr. Sanford Freedman* argued the cause for respondents (*Mr. Samuel Kaufman* and *Mr. John M. Kaufman* on the brief; *Messrs. Bilder, Bilder & Kaufman,* attorneys).

The opinion of the court was delivered by

HEHER, J. We have here a proceeding in equity under the New Jersey Fair Trade Act (*R. S.* 56:4–3, *et seq.*) for the recovery of damages to good will and property of $10,000 ensuing, as is said, from the advertising, offering for sale, and the sale by the defendant retail druggists at stores in Newark, New Jersey, of trademarked and branded pharmaceutical preparations and commodities produced, sold and distributed by plaintiff, a New Jersey corporation, at less than the retail prices established by plaintiff for the trade from time to time pursuant to the cited Fair Trade Act, and for an injunction against a repetition of such acts.

The Superior Court gave summary judgment in favor of defendants; and plaintiff's appeal to the Appellate Division of the Superior Court was certified here for decision on our own motion.

Unlike the case of *Johnson & Johnson v. Charmley Drug Co.*, 11 *N. J.* 526, the asserted obligation of defendants to conform to the prices fixed by the plaintiff producer and distributor is grounded not in a "contract" or an "agreement" made by defendants with plaintiff or an intermediate wholesaler or distributor of plaintiff's products under a mutual price-maintenance arrangement, but rather in the "nonsigner" clause of the State Fair Trade Act classifying as actionable "unfair competition" the willful and knowing advertising, offering for sale, or the sale at less than the price stipulated in any contract entered into pursuant to the provisions of section 5 of the act, regardless of whether the actor is or is not a party to such contract. *R. S.* 56:4–6.

The complaint alleges that notwithstanding "notice and knowledge" of price-maintenance contracts made by plaintiff with retailers in New Jersey for the protection of plaintiff's good will symbolized by descriptive trademarks, brands and labels, defendants "offered for sale and sold the products of plaintiff at less than the minimum resale prices." And it was stipulated in the pretrial order that defendants "are not at this time parties to a fair trade contract with the plaintiff,

and the case is to be tried as if the defendants are non-contracting parties with the plaintiffs under the Fair Trade Act of New Jersey."

Sales made in disregard of the minimum price standard thus set by plaintiff are conceded; they are defended as sales in interstate commerce by noncontracting retailers who are not comprehended in the immunizing provision of the Miller-Tydings Amendment of the Sherman Anti-Trust Act. 26 *Stat.* 209, *c.* 647; 50 *Stat.* 673, 693, *c.* 690; 15 *U. S. C. A., sec.* 1.

This is the substance of the points made for reversal of the judgment: (1) Price maintenance "is no longer *per se* a violation" of the Sherman Act, and so it is requisite that there be an allegation and proof of "unreasonable" restraint of trade to bring the case within the interdiction of the Sherman Act, an issue in its very nature not determinable upon motion for summary judgment; and (2) the Interstate Commerce Clause of the United States Constitution (*Article I, section VIII, paragraph* 3) is not justly susceptible of a construction that will deprive New Jersey "of its right to legislate under the police power concerning economic conditions and public welfare."

The argument runs thus:

Since the passage of the Miller-Tydings Amendment of August 17, 1937, "price maintenance may be valid under" the Sherman Act, and "if this is so and price fixing or price maintenance is no longer illegal '*per se*,' " only "an unreasonable restraint of trade" will constitute a violation of the Sherman Act, and the issue is one for "a final hearing on the facts." Indeed, it is contended that the amendment "removed from the '*per se*' category resale price maintenance." The reasoning is that under the amendment "not all price fixing is illegal," and therefore "price fixing is no longer illegal *per se*," and it is now requisite that the Sherman Act be examined "not in light of the public policy as it existed in 1911," when the case of *Dr. Miles v. John D. Park & Sons Co.*, 220 *U. S.* 373, 31 *S. Ct.* 376, 55 *L. Ed.* 502 (1911) was decided, "but public policy in 1952."

And it is urged that where "interstate commerce has terminated," and thereby the "objects of commerce come within the sphere of state legislation, the State may exercise its independent judgment and prohibit that which Congress did not see fit to forbid directly"; and that "when the Miller-Tydings Amendment removed from the impact of the Sherman Act contracts or agreements valid under State Fair Trade Acts, there was nothing left in the operation of the State Fair Trade Acts to which the Sherman Act could apply," and the State was free to render noncompliance with the producer's price schedule actionable in tort against noncontracting retailers with notice, a liability not dependent upon "any contract, combination or conspiracy," and therefore not within the purview of the Sherman Act. More specifically, it is said that the state law "creates a tort cause of action, a cause of action in unfair competition which arises when a legal contract is entered into between manufacturer and retailer and notice is given," and the immunity accorded contracts under state law by the cited amendment of the Sherman Act freed the State "to create a cause of action in tort"; the "legal contract then becomes only a condition precedent to a tort action," and "is the determining factor as to when the action in tort ripens."

These grounds are not well taken.

Prior to the adoption of the Miller-Tydings Act, an arrangement for minimum prices in interstate marketing, like other types of price fixing, was illegal *per se.* *Dr. Miles v. John D. Park & Sons Co.*, cited *supra.* Price standardization was inimical to the basic policy of freedom of trade and competition embodied in the Sherman Act.

"Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se.*" *United States v. Socony-Vacuum Oil Co.*, 310 U. S. 150, 223, 60 S. Ct. 811, 844, 84 L. Ed. 1129, 1168 (1940).

To the same effect: *United States v. Univis Lens Co.*, 316 U. S. 241, 62 S. Ct. 1088, 86 L. Ed. 1408 (1942); *United*

*States v. Bausch & Lomb Optical Co.*, 321 U. S. 707, 64
S. Ct. 805, 88 L. Ed. 1024 (1944); *Kiefer-Stewart Co. v.
Joseph E. Seagram & Sons, Inc.*, 340 U. S. 211, 71 S. Ct.
259, 95 L. Ed. 219 (1951).

A system of contracts for price maintenance between
manufacturers and wholesale and retail merchants consti-
tutes unlawful restraint of trade at common law, and as to
interstate commerce was within the interdiction of the Sher-
man Act until the passage of the Miller-Tydings Amend-
ment, even as to proprietary medicines made under a secret
process and identified by distinctive trademarks, brands,
labels, and like insignia. *Dr. Miles v. John D. Park & Sons
Co.*, cited *supra;  Old Dearborn Distributing Co. v. Seagram-
Distillers Corporation*, 299 U. S. 183, 57 S. Ct. 139, 81 L. Ed.
109 (1936).

The Miller-Tydings Act grants but a limited immunity
from the mandate of the Sherman Act against price re-
straints. It immunizes purely voluntary contracts or agree-
ments prescribing minimum resale prices for the specified
trademarked or branded commodities in interstate commerce.
But, unlike the State Fair Trade Law, this act does not have
a nonsigner clause; and minimum price-fixing contracts
are still unenforceable against noncontracting retailers in the
field of interstate commerce. The consensual element is
fundamental in the statutory immunity. "When state regula-
tion provided for resale price maintenance by both those who
contracted and those who did not, and the federal regulation
was relaxed only as respects 'contracts or agreements,' the
inference is strong that Congress left the noncontracting
group to be governed by preexisting law." *Schwegmann
Bros. v. Calvert Distillers Corporation*, 341 U. S. 384, 71
S. Ct. 745, 751, 95 L. Ed. 1035, 19 A. L. R. 2d 1119 (1952).
See, also, *Johnson & Johnson v. Charmley Drug. Co.*, cited
*supra*. Price fixing is illegal *per se* under the Sherman Act
except as modified by the Miller-Tydings Amendment; and
the amendment does not encompass noncontracting retailers.

The sales made by defendants indubitably concerned inter-
state commerce. The subject commodities were purchased by

defendants from jobbers outside New Jersey, for delivery to defendants' retail stores in New Jersey. Plaintiff is engaged in interstate commerce; and there can be no doubt that the particular products, manufactured in New Jersey, to all intents and purposes touching federal power remained in interstate commerce when these purchases were made and thereafter until their resale to the consumer.

The pretrial order stipulates that plaintiff "sells its products manufactured in New Jersey throughout the United States," and "does business from its New Jersey plant in New Jersey and in other states" of the Union. And plaintiff's answers to interrogatories reveal that while its one plant was in New Jersey, it has business offices in seven sister states, and now has fair trade contracts in force in 44 states, all governed by the one price schedule when the complaint herein was filed. All of plaintiff's business in the United States was done from its New Jersey plant; and in 1951 plaintiff spent in excess of $1,000,000 for the advertising of its products on a national scale.

The insistence is that defendants' sales of plaintiff's products were "local retail sales" in Newark, New Jersey, when the subject commodities were no longer in interstate commerce. But the principle of the *Schwegmann* case is to the contrary. It does not matter that here the goods were manufactured at plaintiff's New Jersey plant and eventually sold at retail in New Jersey. The commodities had gone into interstate commerce and were purchased by defendants in New York while still in the channels of commerce between the states, for resale in New Jersey. The distribution was through the medium of interstate commerce. But the purchase of the goods in New York is not necessarily a differentiating circumstance. The sales to the consumer on the local level constituted an integral part of the interstate process comprehended in the Commerce Clause of the United States Constitution.

Intrastate activities may be so related to interstate commerce as to be subject to federal regulation. The economic effects of the intrastate practice upon the interstate

commerce may call for the exercise of the national regulatory power for the protection of an interest within the federal province. *Wickard v. Filburn*, 317 *U. S.* 111, 63 *S. Ct.* 82, 87 *L. Ed.* 122 (1942); *Mandeville Island Farms v. American Crystal Sugar Co.*, 334 *U. S.* 219, 68 *S. Ct.* 996, 92 *L. Ed.* 1328 (1948).

The exercise of the commerce power is not confined to the regulation of commerce between the states. It reaches those activities intrastate which so affect interstate commerce as to render regulation appropriate to a legitimate end in the federal field. The federal regulatory authority

"extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power. * * * Competitive practices which are wholly intrastate may be reached by the Sherman Act, 15 *U. S. C. A.* §§ 1–7, 15 note, because of their injurious effect on interstate commerce. * * * So too the marketing of a local product in competition with that of a like commodity moving interstate may so interfere with interstate commerce or its regulation as to afford a basis for Congressional regulation of the intrastate activity. It is the effect upon the interstate commerce or its regulation, regardless of the particular form which the competition may take, which is the test of federal power." *United States v. Wrightwood Dairy Co.*, 315 *U. S.* 110, 62 *S. Ct.* 523, 86 *L. Ed.* 726 (1942).

If the economic process involves intrastate as well as interstate action, as a unitary whole, it is of no moment whether the restraint operates upon the one or the other activity, if interstate commerce is substantially affected. Given a restraint of the character banned by the Sherman Act, "though arising in the course of intrastate or local activities, and a showing of actual or threatened effect upon interstate commerce, * * * the restraint must fall." *Mandeville Island Farms v. American Crystal Sugar Co.*, cited *supra*, 334 *U. S.* 219, 68 *S. Ct.* 1005.

"The source of the restraint may be intrastate, as the making of a contract or combination usually is; the application of the restraint may be intrastate, as it often is; but neither matters if the necessary effect is to stifle or restrain commerce among the states. If it is interstate commerce that feels the pinch, it does not matter

how local the operation which applies the squeeze." *United States v. Women's Sportwear Manufacturers Association*, 336 *U. S.* 460, 69 *S. Ct.* 714, 716, 93 *L. Ed.* 805 (1949).

A distinction is to be made "between a course of conduct wholly within a state and conduct which is an inseparable element of a larger program dependent for its success upon activity which affects commerce between the states." *United States v. Frankfort Distillers, Inc.*, 324 *U. S.* 293, 65 *S. Ct.* 661, 663, 89 *L. Ed.* 951 (1945).

▉ The distribution of plaintiff's products is a nationwide economic operation designed to market the goods under a uniform minimum price standard, if that can be accomplished by contracts or agreements pursuant to the several state fair trade acts; and intrastate activities to that end are so intimately identified with the interstate commerce as to be an integral and inseparable part of it. The regulation of the local market is an integral part of a larger policy that depends for its consummation upon the activity which directly affects commerce between the states. *Vide Johnson & Johnson v. Weissbard*, 11 *N. J.* 552. But the Sherman Act, as thus amended, forbids coercive conformance to the minimum price schedule by the noncontracting retailers. The Sherman Act "left no area of its constitutional power unoccupied; it 'exercised "all the power it possessed." ' " *United States v. Frankfort Distillers, Inc., cited supra*. The Supremacy Clause of the Federal Constitution governs. *Article VI, paragraph 2.*

▉ By a supplemental brief, plaintiff suggests that if its application for a permanent injunction were to be considered now, the McGuire Act adopted by the Congress July 14, 1952, after this appeal was taken, as an amendment to the Federal Trade Commission Act (*Public Law* 542, *c.* 745, *H. R.* 5767) would prevail, and therefore the case should be heard "on its merits." This statute would seem to include the nonsigner provisions of state fair trade laws within the immunity granted by the Miller-Tydings Act.

But we are not concerned with a statute retroactive in operation. The McGuire Act has no effect whatever upon

the transactions here involved; and it would be contrary to simple justice and sound orthodox practice now, in this very proceeding, to enjoin the repetition of acts lawful when done but rendered unlawful thereafter by a legislative act supervening the judgment properly dismissing the complaint for want of a cause of action. The judgment should be affirmed as well founded·in the law, not reversed for the issuance of an injunction upon a complaint that does not charge transgressions of the altered statutory law or impending injury from violations of the new law.

An injunction usually issues to prevent an anticipated or threatened injury, either to protect ·against a repetition of unlawful conduct or to guard against reasonably apprehended misconduct or infringement of legal right. *Bayonne Textile Corporation v. American Federation of Silk Workers,* 116 *N. J. Eq.* 146 (*E. & A.* 1934). If the need for injunctive relief arises, the remedy may then be invoked. The legal sufficiency and application of the McGuire Act remain to be determined in proceedings in the normal course involving transactions subsequent to its adoption.

Judgment affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING and BRENNAN —6.

*For reversal*—None.