VORNADO, INC., a Corporation of the State of Kansas, Plaintiff,

v.

CORNING GLASS WORKS, a Corporation of the State of New York, Isaac Lehrhoff, trading as I. Lehrhoff & Co., and H. Schultz & Sons, a Corporation of the State of New Jersey, Defendants.

Civ. A. No. 723-63.

United States District Court
D. New Jersey.

June 20, 1966.

Wilentz, Goldman & Spitzer, by Allen Ravin, Perth Amboy, N. J., for plaintiff.

Pitney, Hardin & Kipp, by Clyde A. Szuch, Newark, N. J., for defendant Corning Glass Works.

Abe W. Wasserman, Newark, N. J., for defendant I. Lehrhoff.

Shanley & Fisher, by John Kandravy, Newark, N. J., for defendant H. Schultz & Sons.

## OPINION

WORTENDYKE, District Judge.

The branch of this Court's jurisdiction invoked in this case is alleged to rest upon 15 U.S.C. § 15. The plaintiff, a Kansas corporation, claims to have been injured in its business by reason of violations of the Anti-Trust Laws by the defendants. The defendant Lehrhoff resides in the District of New Jersey, Corning Glass Works (Corning), although a corporation of the State of New York, and H. Schultz & Sons (Schultz), a corporation of the State of New Jersey, are found and have agents in the District of New Jersey. The plaintiff (Vornado),

although a corporation of the State of Kansas, has its principal place of business in Garfield, New Jersey, and is found in this District.

The complaint is in six counts, but critical allegations of the first count are incorporated by reference in the succeeding counts and underlie the cause of action alleged in each of the counts.

In the first count, the plaintiff alleges that it is engaged in interstate commerce, and purchases, distributes and sells merchandise in various States through retail department stores popularly known as "Two Guys from Harrison". In connection with its operations, the plaintiff operates a trading stamp plan under which it redeems, for merchandise in its retail department stores, stamps issued to its customers in connection with purchases of food in those stores. Corning is engaged in the design, manufacture, sale and distribution of household products, popularly known as "Corning Ware" among the several States. Corning Ware is a " * * * prestige line of glass cookware having a distinctive quality of transferability to temperatures from below freezing to above boiling without damage." Lehrhoff and Schultz are distributors of Corning Ware. Plaintiff alleges that in September 1962 and prior thereto, Corning entered into agreements with Lehrhoff and Schultz by the terms of which the prices at which Lehrhoff and Schultz could sell Corning Ware to their respective customers, including Vornado, were fixed. These agreements also fixed the prices at which customers of Lehrhoff and Schultz including Vornado, could sell Corning Ware at their respective retail department stores. It is the plaintiff's contention that the foregoing agreements were intended to and did fix prices of Corning Ware, and that thereby competition in prices was reduced as between the sale by Corning's distributors to their customers, including the plaintiff, and as between the plaintiff and its competitors, in violation of the provisions of 15 U.S.C. § 1. Plaintiff claims that in consequence of such viola-

218

tion it was injured in its business, and accordingly seeks treble damages pursuant to 15 U.S.C. § 15.

The second count of the complaint alleges that under date of September 20, 1962 plaintiff and Corning entered into an agreement whereby plaintiff was appointed an authorized dealer of Corning and as such became entitled to purchase Corning Ware, and to sell and distribute that product in its retail department stores. This agreement obligated Corning to supply Corning Ware to its distributors Lehrhoff and Schultz for resale to plaintiff. It is alleged that the parties operated in accordance with this agreement from September 20, 1962 until May 1963; but plaintiff charges that, in the latter month, Corning, in concert with Lehrhoff and Schultz, refused to permit the plaintiff to purchase Corning Ware, and that Corning induced these distributors not to sell Corning Ware to plaintiff because of plaintiff's refusal to engage in the price fixing scheme of the defendants. This conduct is alleged to have injured plaintiff in its business. Plaintiff seeks treble damages, and also prays injunctive relief from interference by the defendants with the sale of Corning Ware to the plaintiff.

In the third count, after incorporation therein by reference of the allegations of the second count, it is alleged that Corning intentionally breached its agreement of September 20, 1962 with the plaintiff, whereby plaintiff suffered loss of profits and was deprived of the benefit of extensive advertising and promotional expenses, for which plaintiff seeks compensatory damages.

The fourth count of the complaint alleges that on February 5, 1963 plaintiff was appointed an authorized dealer of Corning by the provisions of an agreement entered into between the parties. It is further alleged that on that date, by virtue of its said status as an authorized dealer, plaintiff became entitled to purchase Corning Ware, and to sell and distribute the same in its retail department stores, and that Corning became obligated to supply its distributors

with Corning Ware for resale to the plaintiff. The parties to this agreement operated thereunder from the date thereof until May 1963 when, alleges plaintiff, the defendants, acting in concert, refused to permit plaintiff to purchase Corning Ware and, in violation of 15 U.S.C. § 1, induced its distributors not to sell Corning Ware to the plaintiff because of plaintiff's refusal to participate in the price fixing scheme of the defendants. It is contended that plaintiff was thus precluded from engaging in the purchase and sale of Corning Ware among the several States, and thereby lost substantial profits and the benefit of extensive advertising and promotional expenses, for which plaintiff seeks treble damages, together with injunctive relief against further interference with the sale of Corning Ware to plaintiff.

In the fifth count, plaintiff charges Corning with an intentional breach of its agreement with the plaintiff, and claims consequential damages therefor.

Finally, plaintiff seeks treble damages in the sixth count, which incorporates by reference the allegations of the second count, charging Corning with having prohibited plaintiff's purchase of Corning Ware from Corning's distributors by threats and intimidations constituting malicious and intentional interference with the business relationship previously enjoyed by the plaintiff with Lehrhoff and Schultz.

The identification of Lehrhoff as a corporation and Schultz as a partnership, as set forth in the first count of the initial complaint, was revised in the first count of an amended complaint by the allegation that Isaac Lehrhoff, trading as I. Lehrhoff & Co., is a distributor of Corning Ware, and H. Schultz & Sons, a New Jersey corporation, is likewise a distributor of such merchandise. The parties have entered into a written stipulation of facts for the purpose of this action, and agreed that the facts so stipulated shall be taken to constitute the evidence upon which this Court shall base its decision. I accept that stipulation. In addition to those facts already here-

inabove recited, the following facts are found.

■ Although Corning was not licensed to transact business in the State of New Jersey when this action was instituted on September 3, 1963, it qualified to do so in that State on November 8, 1963 while this case was pending for decision. It may therefore defend its fair trade program in this suit. Peter Doelger Brewing Corp. v. Spindel, 186 A. 429, 14 N.J.Misc. 523 (Dist.Ct.1936) cited with approval in Menley & James Laboratories, ltd. v. Vornado, Inc., 90 N.J.Super. 404, 217 A.2d 889 (1966); See also Commercial Credit Corp. v. Boyko, 103 N.J.L. 620, 137 A. 534 (E. & A. 1927).

During 1962 and 1963, certain Corning research employees were stationed in a research laboratory at Plainsboro, New Jersey known as The Industrial Reactor Laboratory. These employees utilized the facilities of the reactor at this location. Corning had a one-tenth ($\frac{1}{10}$) interest in this reactor. During this same period, Corning had certain salesmen, working from their homes in New Jersey, who were reimbursed by Corning for the expenses of telephone calls made on behalf of Corning. One of these salesmen was engaged in the promotion of Corning Ware sales by Corning to its wholesale distributors, but none of the sales personnel ever called upon plaintiff except in connection with the present case.

The involvement of plaintiff in interstate commerce and its operation of its own trading stamp plan, as alleged in the complaint, are admitted. In connection with that plan, it is stipulated that stamps are issued only in connection with food purchases; usually one stamp for every ten cents (10¢) of the price of such merchandise. On Wednesdays, plaintiff issues its stamps at double the usual rate, and frequently issues bonus stamps for the purchase of particular food items. Fifteen hundred (1500) stamps are required to fill one of plaintiff's stamp savings books.

Corning's products consist of articles for cooking, storing and serving of food; known as "Corning Ware", "Corning Ware Electromatics" and "Pyrex Ware". These products are purchased for use by consumers, and bear the trademarks, brands or names of Corning. Corning Ware is a line of glass ceramic utensils which are used for cooking, freezing, serving, and storing food products; on the stove, in the refrigerator, or on the table. Corning Ware Electromatics is a line of electric appliances, such as percolators and skillets, composed of glass ceramic material. The material from which Corning Ware and Corning Ware Electromatics are produced is patented; the patent having issued in 1960 to Corning as assignee of one of its employees. Pyrex Ware is a line of glass utensils also used for cooking, freezing, serving, and storing food products, and has been marketed since 1915. There are products on the market, produced by others, in the same general class as Corning Ware, Corning Ware Electromatics and Pyrex Ware which are similar in function and in the same general price range as Corning products. These similar cooking and serving utensils include those made of glass, ceramics, iron, porcelain, enamel, aluminum, copper, magnesium-alloy, stainless steel and teflon-finished or coated products. Among the manufacturers of products similar to Corning Ware and Pyrex Ware are Anchor Hocking Glass Corporation, Farberware, Wear Ever, Ecko, Revere Ware, Mirro, Regalware and Descoware. Corning Ware Electromatics products are similar to those made by General Electric, Farber, Westinghouse, Presto, Sunbeam and Mirro. Corning Ware, Corning Ware Electromatics and Pyrex Ware are in free, fair and open competition with commodities of the same general class produced or distributed by others. Merchandise distributed by Schultz and Lehrhoff among the several States includes Corning Ware, Corning Ware Electromatics and Pyrex Ware.

Corning entered into Authorized Distributor Appointment and Wholesale Fair

Trade Agreements with Schultz and Lehrhoff. Those with Schultz are respectively dated February 7, 1962 and January 31, 1963; those with Lehrhoff are dated respectively February 2, 1962 and January 18, 1963. Corning also entered into an Authorized Dealer Appointment and Fair Trade Agreement with plaintiff which are respectively dated September 20, 1962 and February 5, 1963. The Schultz and Lehrhoff agreements cover sales by Corning to Schultz and Lehrhoff who, as wholesalers, sell the merchandise to persons, including plaintiff, dealing with the consumer public.

Corning has spent over $3,000,000 annually in advertising its products and the trademarks thereon, and in creating good will toward the same. The purchasing public knows, asks for and purchases Corning's products by their trademarks. Corning Ware and Corning Ware Electromatics have been fair-traded since their respective introductions to the market in 1958 and 1960. Pyrex Ware has been fair-traded since the enactment of the Miller-Tydings Act in 1936. Corning has entered into fair trade contracts with respect to Corning Ware, Corning Ware Electromatics and Pyrex Ware in every State in which such contracts are permitted by law. It has entered into 3,071 such contracts in the State of New Jersey. Corning publishes and distributes its fair trade prices, including written amendments thereto whenever they occur, to retailers, including the plaintiff. The functions of a number of Corning's employees include the establishment and enforcement of Corning's fair trade policies. The means employed in such enforcement include shopping and purchasing Corning products from those alleged to be underselling their applicable fair trade prices, sending letters and telegraphic notices to persons found to be underselling such prices, instituting injunction proceedings, and terminating business relationships in all cases where compliance is not obtained by means of letter or telegram. During the period from November 1957 to June 1965, Cor-

ning has obtained 86 permanent injunctions throughout the United States, 18 of which have been obtained in the State of New Jersey.

Trading stamp companies represent a category of distributors of Corning products. Corning's total sales to destinations in New Jersey in 1962 were $1,-693,000; in 1963 $1,751,000 and in 1964 $1,874,000. Corning's total sales to trading stamps companies in New Jersey in 1962 amounted to $191,000; in 1963 $170,000 and in 1964 $185,000. Many trading stamp companies maintain redemption centers in the trading areas of plaintiff's stores. Sperry & Hutchinson alone had 22 redemption centers in New Jersey as of January 1, 1965. Trading stamp companies sell their stamps to retail merchants in plaintiff's trading areas.

In addition to being available for purchase from retail stores which sell them, the products of Corning are obtainable by holders of trading stamps from such trading stamp companies as Sperry-Hutchinson Company (Green Stamps), Blue Chip Stamp Company (Blue Chip Stamps), Top Value Enterprises, Inc. (Top Value Stamps), MacDonald Stamp Company (Plaid Stamps), Gold Bond Stamp Company (Gold Bond Stamps), Merchants Green Stamp Co. (Merchants Green Stamps), King Korn Stamp Company (King Korn Stamps), Stop and Save Stamp Company (Triple-S Blue Stamps), Frontier Savings Stamps, Inc. (Frontier Stamps), Big Bonus Stamp Co. (Big Bonus Stamps), and Gold Bell Gift Stamps (Gold Bell Gift Stamps). The respective trading stamp savings books of Top Value, Gold Bond, Merchants Green, and King Korn hold 1500 stamps each. The respective savings books of the other companies listed contain 1200 stamps each. The usual rate of issuance of trading stamps to consumers by retail merchants is 10 for $1.00 of merchandise purchased. From time to time, certain retail merchants increase the rate of issuance of trading stamps to consumers on particular days and for particular products; but in connection with Cor-

ning products, the issuance rate cannot exceed 3% of the fair trade price of the product.[1]

The number of full stamp books necessary to secure Corning products from trading stamp companies varies with the particular item involved. A complete list of the number of books needed in each instance is disclosed in the respective stamp company catalogs for 1964. Corning does not have any agreement with trading stamp companies prescribing the number of stamp books which shall be required to secure a Corning product. That determination is left solely to the trading stamp companies. Corning has consistently treated the operations of trading stamp companies as not being within Corning's fair trade program. Corning does, however, make suggestions to the stamp companies regarding the number of books needed to secure their products, with the object of insuring that the redemption value of the stamps approximates the retail fair trade selling price of the products. The stamp companies, however, have not agreed to follow Corning's suggestions. Corning considers a full book of 1200 stamps to have a value of $3.00, and a full book of 1500 stamps as having a value of $3.75. The respective redemption catalogs of trading stamp companies list fair-traded products other than those of Corning, but the stamp companies have not signed fair trade agreements with any of the manufacturers of fair-traded products respecting the number of books to be required to secure such products.

In plaintiff's trading stamp business, it advertises that its book of stamps is worth $2.25 in any of the departments of the "Two Guys from Harrison" stores. This statement is disclosed on its trading stamp books. From time to time, plaintiff increases the value of its trading stamp books when used in connection with the purchase of particular items selected by plaintiff for use for promotional purposes. Sperry & Hutchinson and other trading stamp companies do not assign fluctuating redemption values to their full stamp savings books.

Under plaintiff's stamp redemption plan, merchandise may be secured for a combination of stamps and cash. Sperry & Hutchinson and other trading stamp companies do not permit such a practice, and redemptions are permitted solely for stamps. Under plaintiff's plan, if an item of merchandise has a sale price of $4.50, this item may be obtained for two full stamp books, each having a value of $2.25, or for one filled stamp book and $2.25 in cash. When plaintiff increases the value of its full stamp books in connection with a particular promotion, the number of books or amount of cash needed is reduced. In the case of an item priced at $4.50, if the value of the stamp book for promotional purposes were increased to $4.00, only one book and fifty cents (50¢) in cash would be needed to obtain the item. However, in connection with items which plaintiff decides are being validly fair-traded by manufacturers such as Revlon cosmetics or Parker & Schaeffer pens, the value of the stamp book never increases beyond the $2.25 figure. Thus, a Parker pen with a fair trade price of $4.50 could be bought from plaintiff for 2 books, one book and $2.25, or $4.50 in cash.

In a New Jersey newspaper in October 1962, plaintiff advertised a Corning Ware Electromatic 10-cup percolator for $17.95 plus one filled stamp book. Corning's fair trade price for that item at that time was $29.95. Plaintiff was requested not to honor the advertised promotion because of Corning's belief that to do so would violate its fair trade policies. Plaintiff accordingly agreed to discontinue, and did discontinue the running of the advertisement for a period of time sufficient to enable Corning to consider plaintiff's request for the appointment of Leeds-Fox Corporation, a wholly-owned subsidiary of plaintiff, as Corning's distributor. Corning elected not to make such an appointment. In April

---

1. This 3% limitation is set forth in Schedule A annexed to Corning's Fair Trade Agreements.

1963, plaintiff again inserted in a New Jersey newspaper an advertisement of Corning Ware products for sale for a combination of cash and trading stamp books. As before, the advertised value for each trading stamp book was greater than $2.25; the amount of increased value depending upon the fair trade price of the item in question. In the instance of one item, for which $10.95 had been fixed as a fair-trade price, one stamp book was worth $6.00. In connection with a $14.95 fair trade price item, one book was worth $8.20, and in connection with a $29.95 fair trade price item, one book was worth $14.20. Upon learning of these advertisements, Corning sent a telegram to plaintiff on April 23, 1963 demanding that it cease and desist therefrom, and that it resume the sale of Corning products at their Fair Trade Agreement prices. On the same date, Corning wrote a letter to the plaintiff confirming the telegram and enclosing the current fair trade minimum retail price list for Corning Ware, Corning Ware Electromatics, and Pyrex Ware. On the following day, however, similar advertisements by plaintiff appeared in the Newark Evening News and in the Paterson Evening News, both daily newspapers of vast circulation in the Northern New Jersey area. The same advertisement appeared again on April 25, 1963 in the Newark Star Ledger, another New Jersey paper of large circulation; and again on May 1 and May 8, 1963 in the Newark Evening News. Discussions again had by Corning's representatives with plaintiff in efforts to compel a cessation of these advertising practices were unavailing because Corning refused to make plaintiff's subsidiary, Leeds-Fox Corporation, one of its distributors. Consequently, on April 30, 1963, Corning advised plaintiff by registered mail of Corning's election to terminate plaintiff's Authorized Dealer Appointment and the Fair Trade Agreement with plaintiff in accordance with its terms. That letter was received by plaintiff on May 3, 1963. Under date of May 1, 1963 Corning advised all of its Pyrex Ware, Corning Ware Electro-matics, and Corning Ware distributors that it had given notice to plaintiff of the termination of the Fair Trade Agreement between them. Plaintiff telegraphed Corning of its inability to secure Corning Ware products from Corning distributors. Corning responded with advices that, if plaintiff would agree to maintain fair trade prices, further shipments would be made by the distributors.

When Schultz received the notice, dated May 1, 1963, from Corning that it had informed plaintiff of the termination of the Fair Trade Agreement between them, Schultz had on hand an unfilled order from the plaintiff. Upon being advised by telephone of that situation, Corning authorized Schultz to ship any orders of plaintiff which it had on hand during the ten day period following the notice of termination of plaintiff's Fair Trade Agreement. Schultz filled plaintiff's order in question; but upon receiving a subsequent order, dated May 28, 1963, Schultz wrote to plaintiff, under date of May 31, advising that it regretted its inability to fill this order due to the fact that plaintiff was no longer a franchised Corning dealer.

Lehrhoff refused to transact further business with plaintiff because of plaintiff's failure to pay a then outstanding indebtedness owed by plaintiff to Lehrhoff.

Despite Corning's objections, plaintiff sold its products as advertised in the advertisements complained of, and has failed and refused to agree to discontinue the practice. At the same time, however, plaintiff continued to maintain Corning's fair trade prices on all purchases of its products made for cash without stamps.

The combination of cash-and-stamp promotions of Corning products by the plaintiff resulted in the sale of those products for approximately 40% less than the price for which they would have been sold for cash only, in accordance with Corning's fair trade prices. In these cash-and-stamp transactions, plaintiff was either making no money or taking a small loss. Plaintiff's running of the criticized advertisements was induced by

its belief that they would attract the greatest number of customers to plaintiff's store at the time.

The only agreement between the defendants relating to the fixing of the prices for Corning's products is that contained in the Fair Trade Agreements hereinbefore described. The reason why Schultz and Lehrhoff have refused to sell Corning's products to the plaintiff since their receipt of notice of Corning's termination of plaintiff's dealership has been their contractual obligation under their agreements with Corning which prevented them from selling Corning's products to persons who did not abide by Corning's fair trade prices.

### CORNING'S FAIR TRADE AGREEMENTS

As of September 20, 1962 and February 5, 1963, respectively, Vornado and Corning entered into written agreements by the terms of which Corning authorized Vornado to represent itself as an authorized Corning Ware, Corning Ware Electromatics, and Pyrex Ware dealer, and to use as selling aids the trademarks, brands or names identifying these products as long as each agreement remained in effect, and as long as Vornado lived up to its obligations as a dealer thereunder. In consideration of Corning's authorization of Vornado to act as a dealer in Corning's products, Vornado agreed " * * * to act as such an authorized dealer for the purpose of advertising, offering for sale and selling Corning Ware, Corning Ware Electromatics and Pyrex Ware to consumers at retail, subject to all of the terms and conditions of [the] agreement and not otherwise, and * * * not to make any use of Corning trademarks, brands or names which will in any manner injure or destroy their value to Corning." Vornado further agreed, in each of these agreements, "In States having Fair Trade laws but not elsewhere * * * not to advertise, offer for sale or sell directly or indirectly any Corning Ware, Corning

Ware Electromatics, or Pyrex Ware at prices less than those now or hereafter designated and set forth in Schedule A as such schedule may be constituted from time to time exclusive of all applicable sales and use taxes". Vornado also agreed " * * * not to sell or transfer Corning Ware, Corning Ware Electromatics or Pyrex Ware to any other dealer unless dealer has been appointed an authorized dealer and has agreed to maintain Corning's resale prices by signing an agreement identical with this agreement. The burden of determining whether another dealer has agreed to maintain Corning's resale prices is upon the dealer making the sale." The term of each of the agreements between Vornado and Corning was 5 years, commencing on the date as of which the agreement became effective.

Within the effective period of these agreements with Vornado, and at all times herein relevant, there were in effect between Corning and Lehrhoff and Schultz, respectively, agreements effective for the term of one year, designating the respective party a distributor of Corning products described in the Vornado agreements. By the provision of these distributor agreements, the distributors agreed to carry an adequate stock of Corning's products, consistent with the return or sale to retail dealers, and to cooperate with Corning in developing the respective distributors' maximum sales potential of those products. The distributor, *inter alia*, agreed to refrain from advertising, offering for sale, or selling, directly or indirectly, any of the stated products at prices less than those set forth in Schedule A, less the discounts listed in Schedule B [2] applicable to the products sold, exclusive of all applicable sales and use taxes; and to refrain from selling or transferring any of such products to any other distributor unless such other distributor had been appointed an authorized distributor of Corning's products, and had agreed to maintain Corning's resale prices by signing an agreement identical to that under-

---

2. These schedules were attached to the agreements.

taking the obligation. In the Lehrhoff agreement of January 18, 1963, and in the Schultz agreement of January 31, 1963, each distributor agreed not to sell or transfer the products in question to any reseller unless such reseller had agreed with Corning to maintain Corning's fair trade prices.

Section 1 of the Sherman Act as amended by the Miller-Tydings Act, 15 U.S.C. § 1, provides:

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal: *Provided,* That nothing contained in sections 1–7 of this title shall render illegal, contracts or agreements prescribing minimum prices for the resale of a commodity which bears, or the label or container of which bears, the trademark, brand, or name of the producer or distributor of such commodity and which is in free and open competition with commodities of the same general class products or distributed by others, when contracts or agreements of that description are lawful as applied to interstate transactions, under any statute, law, or public policy now or hereafter in effect in any State, Territory, or the District of Columbia in which such resale is to be made, or to which the commodity is to be transported for such resale, and the making of such contracts or agreements shall not be an unfair method of competition under section 45 of this title: *Provided further,* That the preceding proviso shall not make lawful any contract or agreement, providing for the establishment or maintenance of minimum resale prices on any commodity herein involved, between manufacturers, or between producers, or between wholesalers, or between brokers, or between factors, or between retailers, or between persons, firms, or corporations in competition with each other." [Penalty provisions omitted]

At all times hereto relevant, N.J.S.A. 56:4–5(1) provided as follows:

"(1) No contract relating to the sale or resale of a commodity which bears, or the label or content of which bears, or the vending equipment from which said commodity is sold to consumers bears, the trade-mark, brand, or the name of the producer or owner of such commodity and which is in fair and open competition with commodities of the same general class produced by others shall be deemed in violation of any law of this State by reason of any of the following provisions which may be contained in such contract:

(a) That the buyer will not resell such commodity except at the price stipulated by the vendor;

(b) That the producer or vendee of a commodity require upon the sale of such commodity to another, that such purchaser agree that he will not, in turn, resell except at the price stipulated by such producer or vendee."

■ The provisions of the Fair Trade Agreements, between Corning and Vornado on the one hand, and Corning and each of its distributors on the other, were in all respects in conformity with the provisions of N.J.S.A. 56:4–5(1) and, therefore, within the exemptive proviso set forth in 15 U.S.C. § 1. Vornado complied with its agreement with Corning until May 1963. Corning has policed and enforced all of its 3,071 Fair Trade Agreements with dealers in the District of New Jersey. It participated in no price fixing other than that prescribed by the terms of its resale price maintenance contracts with dealers which were authorized by the provisions of the New Jersey statutes. The restrictions imposed upon dealers by the terms of their Fair Trade Agreements with Corning are and have been uniform, and indiscriminately enforced. The trading stamp companies to which Corning's products were sold were not prospective resellers of its products within the contemplation of 15 U.S.C. § 1 or N.J.S.A. 56:4–5(1).

■■ Although Corning did not sell directly to Vornado, the Fair Trade

Agreement between those parties is valid under N.J.S.A. 56:4–5(1). That validity is not impaired by the fact that the Fair Trade Agreement fixed a minimum retail price rather than a specifically stipulated price. Menley & James Laboratories, Ltd. v. Vornado, Inc., supra 217 A.2d at 893, citing Lionel Corp. v. Grayson-Robinson Stores, 15 N.J. 191, 104 A.2d 304 (1954), appeal dismissed 348 U.S. 859, 75 S.Ct. 87, 99 L.Ed. 677 (1954). In *Menley*, the action was brought for injunctive relief against a retailer, not a party to plaintiff's New Jersey fair trade contract with another retailer, to prevent the retailer from selling products of the plaintiff at a price less than the stipulated minimum retail sale price established by the contract with the other retailer. The defendant retailer had notice of plaintiff's fair trade contract, and of the minimum retail prices established thereunder; and that the plaintiff intended to enforce those prices. Despite such notice, the defendant sold such products at less than the stipulated minimum retail prices. The defendant (Vornado) contended that the plaintiff had no standing to sue under the New Jersey Fair Trade Statute, N.J.S.A. 56:4–3 et seq., because plaintiff was neither the producer nor the distributor of the commodity in question. The evidence disclosed, however, that the trademarks borne by the commodity and its package were registered to the plaintiff, whose name appeared upon the package. Although the commodity was produced and warehoused by employees of the parent corporation of the plaintiff, these services and the expense of advertising the product were paid for by the plaintiff. Defendant also contested plaintiff's standing to sue because plaintiff sold its product directly to drug wholesalers or to retail chain stores having at least ten outlets and its own warehouse facility, with a registered pharmacist employed in each outlet, while maintaining fair trade agreements with retailers only. Defendant argued that N.J.S.A. 56:4–5(1) (a), obligating the fair trade contract buyer to refrain from reselling the commodity except at the price stipulated by the vendor, could not be extended to agreements between producers and remote vendees intending to offer the product for resale; but must be limited to agreements between a vendor and his immediate vendee. Upon the authority of General Electric Company v. Kimball Jewelers, 333 Mass. 665, 132 N.E.2d 652 (Sup.Jud.Ct.1956), the New Jersey court held that a fair trade contract between a producer and a retailer was enforceable despite the fact that the parties in suit had never fair-traded directly with each other. In further support of its conclusion, the *Menley* court cited Corning Glass Works v. Max Dichter Co., 102 N.H. 505, 161 A.2d 569 (Sup. Ct.1960), and General Electric Co. v. Home Utilities Company, 131 F.Supp. 838 (D.Md.1955) aff'd 227 F.2d 384 (4th Cir. 1955). *Menley* followed those cited cases because " * * * the integrity of the product is best preserved in the eyes of the public by regulating the price at which the public can buy the product." (217 A.2d at p. 893). The authorities cited were in accord with the policy of the Fair Trade Act as announced by the New Jersey courts, i. e., " * * * to prevent a destruction of the producer's good will, which is often established at great cost." (at p. 893) This Court approves the reasoning stated, and accepts the authorities cited in *Menley* as ample support for the validity of the provisions of Corning's Fair Trade Agreements with Vornado.

N.J.S.A. 56:4–6 provides:

"Wilfully and knowingly advertising, offering for sale or selling any commodity at less than the price stipulated in any contract entered into pursuant to the provisions under section 56:4–5 of this Title, whether the person so advertising, offering for sale or selling is or is not a party to such contract, is unfair competition and is actionable at the suit of the producer or distributor of such commodity or at the suit of any retailer selling such commodity at not less than the price stipulated in any contract entered into pursuant to

the provisions of section 56:4–5 of this Title."

The validity of the foregoing New Jersey statutory provision has been established by the decision in Old Dearborn Distributing Co. v. Seagram-Distillers Corp., 299 U.S. 183, 57 S.Ct. 139, 81 L.Ed. 109 (1936), which sustained the validity of sections 1 and 2 of the Fair Trade Act of Illinois (Smith-Hurd Rev.Stat.1935 c. 121½, § 188 et seq.) which contained language identical with that of the New Jersey Fair Trade Act. The constitutionality of the Act was sustained by Judge Cohen of this Court in Upjohn Company v. Vineland Discount Health & Vitamin Center, Inc., 235 F.Supp. 191 (D.N.J.1964).

Corning's fair trade agreements conform with the requirements of the New Jersey Fair Trade Act, and are within the exemption provided by the Miller-Tydings Amendment to § 1 of the Sherman Act. Hudson Distributors, Inc. v. Eli Lilly & Co., 377 U.S. 386, 395, 84 S.Ct. 1273, 12 L.Ed.2d 394 (1964). Schwegmann Brothers v. Calvert Distillers Corp., 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951), is inapposite to the case at bar because brought against a "non-signer" of a price fixing contract. Hoffmann-La Roche, Inc. v. Weissbard, 19 N.J.Super. 210, 88 A.2d 238 (1952) aff'd 11 N.J. 541, 95 A.2d 398 (1953) and Lionel Corp. v. Grayson-Robinson Stores, supra, which were cited by Vornado, are similarly distinguishable. The language of the proviso upon which Corning relies is clear, and requires no resort to legislative history for its construction. Schwegmann Brothers v. Calvert Distillers Corp., supra; United States v. Singer Mfg. Co., 374 U.S. 174, 83 S.Ct. 1773, 10 L.Ed.2d 823 (1963).

## THE USE OF TRADING STAMPS

Vornado issues trading stamps only in connection with its food sales. Vornado's food sales are not subject to any fair trade agreement with Corning. One trading stamp is issued by Vornado for every ten cents (10¢) of the price of any food item purchased. These trading stamps are not purchased by Vornado from any of the trading stamp companies named in the findings of fact. Vornado issues its own trading stamps, which are redeemable in merchandise sold by Vornado to its retail customers. On certain days, Vornado issues its stamps at double the usual rate of $2.25 per book of 1500. Frequently Vornado issues bonus stamps. Included among the items of merchandise for which Vornado's trading stamps are redeemable, but which are also sold and offered for sale in cash, are articles of Corning Ware which Vornado has purchased for resale at retail from Corning under the minimum price provisions imposed by the terms of the Fair Trade Agreement existing between Corning and Vornado. Included among the items of merchandise for which the various trading stamp companies redeem their trading stamps sold to and issued by retailers other than Vornado are articles of Corning Ware similar to those sold at retail by Vornado under its Fair Trade Agreement with Corning, and available for redemption to the holders of Vornado's trading stamps. It is conceded that articles of Corning Ware similar to those sold at retail by Vornado are sold by Corning to the various trading stamp companies for redemption of their trading stamps sold to other retailers. It is Vornado's contention that Corning's conceded failure to subject its trading stamp company purchasers of· Corning Ware, other than Vornado, to the resale retail price restrictions imposed upon Vornado, under the terms of its Fair Trade Agreement with Corning, amounts to discrimination which disentitles Corning to avail itself of the exemption contained in the Miller-Tydings Amendment of Section 1 of the Sherman Act, 15 U.S.C. § 1. In support of this contention, Vornado relies upon Texas Co. v. DiGaetano, 39 N.J. 120, 187 A.2d 721 (1963) and Esso Standard Oil Co. v. Secatore's, Inc., 246 F.2d 17 (1st Cir. 1957) cert. den. 355 U.S. 834, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). I deem each of those cases distinguishable and, therefore, inapposite to Vornado's contention.

Corning predicates its charge of Vornado's breach of the Fair Trade Agreement between those parties upon the contention that, by increasing the number of trading stamps which Vornado from time to time issues to a purchaser of an article of food, and because such trading stamps can be used by such food purchasers either with or without cash to acquire from Vornado an article of Corning Ware, Vornado's price for such article was thereby pro tanto reduced below the minimum prescribed by the terms of its Fair Trade Agreement with Corning. Such is the effect of the stipulated facts hereinbefore found.

In Burroughs Wellcome & Co. v. Weissbard, 129 N.J.Eq. 563, 20 A.2d 445 (1941) aff'd 130 N.J.Eq. 605, 23 A.2d 396 (E. & A.1942), the New Jersey court held that the exemption of trading stamp companies from the scope of a producer fair trade program by not requiring the stamp companies to execute fair trade agreements governing the sale of the producer's product to the stamp companies, for use in redemption of trading stamps issued and/or sold by them, does not invalidate the producers fair trade agreements with retail purchasers or destroy the exemption provided by the Miller-Tydings Amendment to 15 U.S.C. § 1.

Moreover, the parties to the case at bar have stipulated, and I have found, that although Corning did not have an agreement with trading stamp companies relating to the number of stamp books to be required to secure a Corning product, it has consistently treated the operations of trading stamp companies, through which Corning products are secured by consumers in exchange for stamp books, as not being within Corning's fair trade program. Vornado's increase in the value of its trading stamp books, when used in connection with the purchase of particular items decided by Vornado to be used for promotional purposes, and its stamp redemption plan whereby merchandise may be secured for a combination of stamps and cash, enables a customer of Vornado to purchase a Corning Ware product at a price below the minimum fair trade retail price prescribed in and under Vornado's agreement with Corning. Consequently, Vornado's advertisement of Corning Ware products for a combination of cash and trading stamp books, where the value of the full book was stated at a figure in excess of $2.25, constituted a violation by Vornado of its minimum price agreement with Corning which entitled Corning to rescind the agreement and to refuse to permit Corning's distributors to continue to sell Corning products to Vornado.

The effect of the Miller-Tydings Amendment to the Sherman Act was to validate vertical fair trade contract systems. Schwegmann Brothers v. Calvert Distillers Corp., supra. Corning's fair trade contracts with Vornado were part of a vertical fair trade system, i. e., an arrangement of agreements between a manufacturer and the wholesalers and retailers of its products. The 1952 amendment to the Commerce and Trade Act, 15 U.S.C. § 45, known as the McGuire Amendment, provided that nothing in that section should render unlawful the exercise or enforcement of any right or right of action created by any statute, law or public policy of any state whose Fair Trade Act contains a "nonsigner" clause. Corning's products were in fair and open competition, and therefore Corning had a legal right to refuse to sell its trademarked products to retailers except upon an agreement to resell only at fair trade prices. Such refusal to sell, for failure to agree to those conditions, did not constitute an unlawful boycott in violation of the Sherman Act. See Sunbeam Corp. v. Central Housekeeping Mart, 2 Ill.App.2d 543, 120 N.E. 2d 362 (1954). Corning's Fair Trade Agreements with Vornado authorized Corning's distributors to refuse to sell Corning's products to Vornado, and Corning's agreements with distributors Lehrhoff and Schultz obligated them to refuse to sell Corning's products to retailers violating fair trade agreements between such retailers and Corning. It

228

follows, therefore, that since Corning's Fair Trade Agreements with Vornado were valid under state and federal statutory law, their violation by Vornado justified the invocation by Corning of the penalty provisions which they contained, as well as the exercise by Corning's distributors of their contractual obligations to Corning in relation to sales of Corning's products to the contract-violating retailer.

The plaintiff Vornado has failed to sustain the causes of action set forth in its complaint against the defendants named therein. It follows, therefore, that each of the said causes of action must be dismissed and judgment entered thereon in favor of each of the defendants against the plaintiff.

Present an appropriate order.